## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| JOHN DOE, | *   CIVIL ACTION NO.: 19-11403 |
| | * |
| Plaintiff | *   SECTION: |
| | * |
| v. | *   MAGISTRATE: |
| | * |
| THE ADMINISTRATORS OF THE TULANE | * |
| EDUCATIONAL FUND, | * |
| | * |
| Defendants | * |
| | * |
| *   *   *   *   *   *   *   * | |

## COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

**NOW INTO COURT**, through undersigned counsel, comes Plaintiff John Doe, who brings this Complaint for Damages and Injunctive Relief against Defendant, The Administrators of the Tulane Educational Fund ("Tulane" or the "University"), and Defendant's employees, agents, successors, and assigns, and in support thereof states the following[1]:

## PRELIMINARY STATEMENT

1.      This is an action for damages, and for injunctive relief to prevent Defendant from causing irreparable harm to John Doe by separating him from his education, that arises from the actions taken and procedures utilized by Tulane and its agents or employees in connection with a disciplinary proceeding initiated against Plaintiff, a male sophomore student at Tulane, concerning false allegations of nonconsensual sexual contact made by fellow Tulane student Jane Roe, and the sanctions that Tulane has imposed as a result of that proceeding.

2.      John Doe is a twenty-year old student who attended a Catholic high school in Texas before matriculating to Tulane. It was Doe's life-long dream to attend Tulane because his

---

[1]      Plaintiff contemporaneously herewith files a motion to proceed pseudonymously.

1

great-grandfather attended Tulane and Doe grew up hearing stories from his grandfather about how much his grandfather loved growing up on and around the Tulane campus where his father attended school. Indeed, Doe's great-grandfather was the captain of the Tulane football team, where he played for two years before WWII, and for two years after the war, when he returned to his family. Doe was even concerned that his grades would not be good enough to attend Tulane, but he worked hard in high school and was accepted to the University. He has excelled in his studies, both in high school and at Tulane, and prior to the allegations at issue here, he has never faced any accusations of misconduct, academic or otherwise.

3.    Now, Tulane has suspended Doe for three semesters, beginning with the Fall 2019 semester and continuing through December of 2020, based on a botched investigation of nonconsensual sexual contact. The investigation and adjudication (to the extent that term can even be applied to Tulane's current process for reaching a decision) were riddled with problems, including the selective enforcement decisions made in initiating the proceeding and the disproportionately severe penalty that Tulane imposed, which led to an erroneous outcome motivated by gender bias.[2]

4.    In that regard, Tulane's current disciplinary process involves only one person: the same person investigates the allegations and makes all determinations as to credibility and the evidence that will be presented in the investigative report, then decides the accused's guilt or innocence, and then decides the sanction to be imposed. It is a system that is designed to be quick and efficient for Tulane, not fair and accurate for the student who is accused.

---

[2]    Indeed, as explained herein, Tulane's investigator, who exhibited bias towards Doe throughout the investigation, initially imposed a four-semester suspension on Doe that was also effective immediately and would have forced Doe to withdraw from the current semester without receiving any credits – a sanction that amounts to a *de facto* expulsion. She was reversed on appeal regarding her excessive sanction, but Tulane upheld the erroneous finding of responsibility on appeal, and incredibly, reduced the suspension by only one semester, a suspension that remains grossly disproportionate.

5.      Therefore, when fellow Tulane student Jane Roe – a student with whom Doe had a previous consensual sexual relationship – reported to the University that John had engaged in nonconsensual touching, Tulane embarked on an investigation that, upon information and belief, it would not have initiated if the accused student had been female, and that was designed to find Doe guilty. The investigator did not consider credibility issues related to Roe's account – or evidence that the allegations may have been motivated by a desire to damage Doe's reputation – and instead, the investigator improperly considered unsubstantiated and unrelated character evidence that cast Doe in a negative light, along with irrelevant evidence concerning Doe's alleged prior sexual activity with other people.

6.      Then, not surprisingly, this same biased investigator found Doe responsible for a sexual assault that he did not commit and suspended him for four semesters, including making the suspension effective immediately which would have caused Doe to lose another semester of credits, even though Doe had been attending classes and participating in University life without restriction during the pendency of the entire four and a half month investigation – a sanction justified primarily on the basis of the same unrelated character evidence and unsubstantiated accusations of third parties. Further, upon information and belief, such an excessive sanction would not have been imposed on a female student for the same conduct.

7.      When Doe appealed the finding and sanction – under the extremely limited parameters of Tulane's woefully inadequate appeal "rights" process – Tulane summarily denied the appeal of the finding of responsibility. As to the sanction, Tulane reduced the length of the suspension slightly: from four semesters to three, but Tulane still initially decided to make the decision on appeal, sent to John just two weeks before final exams and the end of the semester, effective immediately, which would have forced him to lose an additional semester. After being

informed that Doe would seek a temporary restraining order, Tulane relented and allowed Doe to remain in school and finish the semester, without restriction. Nonetheless, Tulane will impose its suspension for the next year and a half, beginning with the Fall of 2019 and continuing until December of 2020.

8.      The investigation and adjudication, thus, failed to ensure fundamental fairness and were infected by gender bias. In addition, despite the paltry procedural protections provided by Tulane's disciplinary process, Tulane substantially deviated from its own policies and procedures and thereby breached its obligations to Doe. The biased and procedurally inadequate handling of this sensitive matter is unacceptable: Doe was accused of quasi-criminal sexual misconduct, and the finding of responsibility for such an offense will have lasting implications on him for years to come.

9.      A non-exhaustive list of Tulane's wrongful actions concerning this matter include: (i) failing to conduct a neutral and fair investigation; (ii) failing to provide Doe proper notice of the charges he faced; (iii) evidencing a gender bias against Doe, as the male accused, throughout the investigative and adjudicative process; (iv) making assessments of credibility and evidentiary weight that demonstrate an inability to remain impartial, despite the existence of countervailing evidence and credibility issues; (v) failing to afford Doe the requisite presumption of innocence required by a preponderance of the evidence standard; (vi) heavily relying on irrelevant and highly prejudicial evidence, for both the finding of responsibility and the sanction, that should have been excluded under Tulane's own policies and procedures; (vii) improperly altering the final investigative report, after it had been finalized, to include additional charges and findings of responsibility in order to further taint the appeal process, and (viii) imposing an excessive and disproportionate sanction, based heavily on unrelated and uninvestigated

4

accusations, all of which demonstrate substantial procedural errors in violation of Title IX and breaches of Tulane's obligations under state law.

10.     Absent an injunction preventing Defendant from imposing the suspension and removing Doe from school, Doe will suffer irreparable harm. Doe expected to graduate from Tulane – the school he has always wanted to attend – in May of 2021. Now, he has been suspended until January of 2021, and is not permitted to transfer in any credits taken at another university during the term of his suspension. As a result of Tulane's actions, Doe's education will be improperly interrupted – possibly for one and a half years.

11.     Moreover, the outcome of Tulane's erroneous decision (February 11th for the initial decision and April 12th for the decision on appeal) at a time when applications to transfer were long since due have also left Doe with few options for continuing his education elsewhere in the Fall and deprived him of a meaningful opportunity to transfer. And given the extremely damaging notation in Doe's disciplinary record that he has been found responsible for sexual assault, Doe will never be able to attend a school of similar quality to Tulane.

12.     Therefore, without injunctive relief, the incorrect and unfair outcome of Tulane's disciplinary proceeding will irreparably harm Doe by interrupting his education or preventing him from completing his education at Tulane, and the attendant loss of future education and employment opportunities that will inevitably result therefrom. Interim relief also will not cause harm to Tulane, who allowed Doe to remain on campus and in class since the allegations were first made in September, or cause harm to Roe, who chose to attend a small class, in which Doe was already enrolled, the entire Spring semester.

13.     Further, if Tulane's erroneous decision is not rectified, Doe will sustain extensive damages, including but not limited to a permanent notation of sexual assault on his

educational records, which will severely compromise his education and career prospects, including his ability to gain admission to graduate school or to become a licensed professional. Additionally, as a result of Tulane's actions and inactions, Doe has suffered psychological harms, such as increased anxiety, and emotional and reputational damages.

14.    Doe therefore brings this action to obtain relief based on causes of action for, among other things, violations of Title IX of the Education Amendments of 1972 ("Title IX"), breach of contract, breach of the covenants of good faith and fair dealing, and detrimental reliance.

## THE PARTIES

15.    John Doe is a natural person, domiciled in the State of Texas. During the events described herein, Doe was a student at Tulane and resided on the University's campus in New Orleans, Louisiana.

16.    Upon information and belief, The Administrators of the Tulane Educational Fund is a non-profit educational corporation with its principal place of business in New Orleans, Louisiana.

## JURISDICTION AND VENUE

17.    This Court has federal question, diversity, and supplemental jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1332, and 28 U.S.C. § 1367 because: (i) the federal law claim arises under the Constitution and statutes of the United States, specifically Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.* ("Title IX"); (ii) John Doe and Defendant are citizens of different states and the amount in controversy exceeds $75,000, exclusive of costs and interest; and (iii) the state law claims are so closely related to the federal law claim as to form the same case or controversy under Article III of the United States Constitution.

18.     This Court has personal jurisdiction over Defendant on the grounds that Defendant is conducting business within the State of Louisiana.

19.     Venue for this action properly lies in this district pursuant to 28 U.S.C. §1391 because the events or omissions giving rise to the claims occurred in this judicial district.

## FACTUAL ALLEGATIONS

### Representations and Agreements Between Plaintiff and Tulane

20.     Because the effects of disciplinary sanctions on an accused student's life have the potential for severe consequences, universities are obligated to ensure that their student disciplinary investigations and proceedings abide by the university's own adopted policies and procedures, as well as federal guidelines that require fundamental fairness.

21.     Tulane's Code of Student Conduct (the "Code") delineates the policies and procedures that the University will utilize in investigating and adjudicating student disciplinary matters, and in particular, in investigating and adjudicating allegations of sexual assault. The 2018-2019 version of the Code is attached hereto as Ex. "A."

22.     Upon Doe's acceptance to the University and payment of tuition and fees, Tulane provided him with copies of University policies, including the Code. Tulane is obligated to comply with the terms of the Code and its other written policies, just as its students are obligated to comply with the Code and University policies.

23.     Specifically, the Code confers upon students certain rights and responsibilities, and provides certain procedures by which the University must adjudicate alleged Code violations, depending upon the nature of the violation and the possible sanction associated with the violation.

**Provisions Related to Initiating Disciplinary Proceedings**

24.     The Code provides that the Director of Student Conduct, or his designee, has the discretion to determine the jurisdiction and parameters of the Code, subject to discretionary review by the Vice President for Student Affairs. *See* Ex. "A," Sec. II. At all times relevant to this litigation, the Director of Student Conduct was Dr. Christopher Zacharda ("Dr. Zacharda"), and the Vice President for Student Affairs was J. Davidson "Dusty" Porter.

25.     The Code mandates different disciplinary procedures, depending on the conduct alleged and the possible sanction. The Code provides for three possible procedures for handling allegations made against an individual (as opposed to an organization): educational conferences, administrative hearings, and investigations. The Code states, in pertinent part, "*Investigations* take place when major transgression of Tulane University rules may have occurred…and matters that may result in expulsion, suspension, or revocation of a degree or recognition of a group. *Major Matters* involve the potential that Tulane University will exercise its right to terminate or suspend the voluntary association with an individual or group." *See* Ex. "A," Sec. VI (emphasis in original).

26.      Recognizing the significance of such proceedings, the Code then states, "*Major matters* may also involve serious, long-term, adverse consequences for an individual or group." *See id*. Tulane, therefore, ensures that the University "uses an investigative procedure administered by trained professionals, subject to substantial review and specified rights to appeal." *See id*.

27.     The Director of Student Conduct is tasked under the Code with the "gatekeeping" function of deciding which type of proceeding the University will initiate with regard to any conduct allegation. The Director can also consult with the Title IX Coordinator "to

determine whether the matter should proceed to an educational conference or move directly to an administrative hearing, or in situations involving potentially major matters, the investigative procedure." *See id.*, at Sec. VI.A.

28.     Prior versions of the Code included examples of conduct that could lead to suspension or expulsion; those parameters have been eliminated from the 2018-2019 version of the Code. Therefore, the Director of Student Conduct and the Title IX Coordinator have the ability, subject to few if any restrictions, to decide how cases will be handled and what procedure will be initiated – based on their subjective view of the seriousness of the allegations and the punishment that may be warranted, all before any objective inquiry of the facts has been conducted.

29.     Upon information and belief, the Director of Student Conduct consults the Title IX Coordinator with regard to this "gatekeeping" function of how an incident will be handled, if it involves any allegations that could be construed as sexual misconduct. At all times relevant to this lawsuit, Tulane's Title IX Coordinator was Meredith Smith.

30.     Notwithstanding that a case that lands in the investigation process has already been pre-judged by at least the Director of Student Conduct and the Title IX Coordinator, the Code promises: "*The mere fact that a situation is being referred for investigation does not indicate any determination of transgression of any kind. The investigation process is exactly that – a neutral and fair investigation with no presumptions of wrongdoing." See id*. (emphasis in original).

31.     However, the entire investigation and adjudication process is conducted by one person, an investigator who is assigned by the Director of Student Conduct. The single-investigator-model has been heavily criticized as an inadequate process for ensuring neutral and fair decision-making or providing fundamental fairness. Upon information and belief, Tulane

currently employs only two investigators, Dawn Broussard and Lex Kelch-Brickner, to conduct all of its student conduct investigations.

<b>Provisions Related to how the Investigation<br>Process Must be Conducted</b>

32.     The investigator issues a notice of investigation to the parties and provides them with a written statement regarding their rights. This document, entitled "Procedural Protections," includes, among other things, the right to be presumed innocent rather than guilty, and the right to receive reasonable protection from "retaliation, intimidation, or harassment" due to the student's participation in the conduct process. *See* Ex. "B," attached hereto.

33.     During the investigation, the investigator gathers evidence and interviews witnesses who may have information relevant to the case. The investigator has the sole discretion to decide what evidence and witnesses are relevant. *See* Ex. "A," at Sec. IV.E. But the Code promises that the investigation process "is designed to provide a fair and reliable gathering of facts by a trained and impartial investigator." *Id*. Moreover, in preparing the investigation report at the conclusion of the case, the investigator can exclude information that she has gathered that is "irrelevant, immaterial, or more prejudicial than informative." *Id*.

34.     Importantly, the investigator can, and should, exclude character evidence because "information regarding character is not relevant to the determination of whether there has been a violation of this Code." *Id*. "Character evidence" is defined in the Code as: "information that does not directly relate to the facts at issue, but instead reflects upon the reputation, personality, qualities, or habits of an individual." *Id.*

35.     Critically, the Code explicitly dictates that with regard to character evidence in most cases, "and certainly involving matters of sexual harassment or sexual assault, a party's

character or reputation with respect to other sexual activity <u>is not relevant and will not be considered as evidence.</u>" *Id*. (emphasis added).

36.     Similarly, the Code states that "a party's prior or subsequent sexual activity is typically not relevant and will only be considered as evidence under limited circumstances." The limited circumstances delineated in the Code are pattern evidence, prior sexual history between the parties, and prior sexual history with other parties. *Id*. Those limited circumstances are further circumscribed by the Code's mandate that pattern evidence must be assessed for relevance based on "whether the previous or subsequent incident was substantially similar to the conduct cited in the report or indicates a pattern of behavior and substantial conformity with that pattern;" the Code mandates that a party's sexual history with anyone other than the complainant or respondent is only relevant "under very limited circumstances to prove intent, motive, absence of mistake, or to explain an injury or physical finding." *Id*.

### Provisions Related to the "Adjudication" Process at the Close of the Investigation

37.     When the investigator decides the investigation is over, the investigator prepares an investigation report that summarizes and includes the evidence the investigator deems relevant. *Id*. There is no hearing at the conclusion of the case; instead, the investigation report declares the investigator's determination of guilt and the investigator's decision regarding the sanction. *Id*.

38.     The Code states that the investigator's determination of guilt will be made by a preponderance of the evidence standard, the lowest evidentiary standard ever applied in a judicial proceeding. *Id*. In reaching her determination of guilt and the sanction to be imposed, the investigator may, but is not required to, consult with other Tulane administrators. *Id*. Upon

information and belief, in matters involving accusations of sexual misconduct, the administrator who the investigator routinely consults is the Title IX Coordinator.

39.     Despite the obvious flaws in a process where the same person decides what facts to include in the investigation report, and then judges those same facts to determine both guilt and consequences, the Code promises that the investigation process "is designed to provide a fair and reliable gathering of facts by a trained and impartial investigator." *Id.*

40.     Notwithstanding that the single investigator is the only person empowered to determine guilt, and the only person empowered to decide the sanction imposed, the Code promises that the determinations will be "subject to review and rights to appeal." *See id*., at Secs. VI.A & E. However, there is no mandatory process under the Code by which anyone other than the investigator reviews the determination of responsibility or reviews the sanction to be imposed.[3] Prior versions of the Code contained significantly more oversight, mandating that the Vice President for Student Affairs review all decisions to suspend a student and empowering him to alter the sanction.

### Provisions Related to Appeal Process

41.     In addition, while the Code describes the appeal process as providing a "right to appeal," the appeal rights are, in fact, very limited. *See id*., at Sec. VI.F. As an initial matter, appeals are denied outright if they are deemed to be based on any grievance with the outcome other than "the permissible grounds" for appeal. *Id*. Further, the "permissible grounds" are extremely narrow – a request for appeal can only be based on: (1) procedural error, which is

---

[3]     Interestingly, the Code expressly provides for oversight protections for organizations accused of misconduct. Under those circumstances, the investigator's findings as to whether wrongdoing occurred are sent to a hearing panel, which recommends the sanction; then, the Assistant Vice President for Campus Life reviews the findings and recommended sanction and can choose to accept or reject the recommendations regarding either or both. *Id*. Under Tulane's Code, it is only individuals accused of wrongdoing who are deprived of meaningful oversight protections and subjected to punishments that a single investigator has the authority to dole out.

defined as material deviation from the proper procedure that substantially impacted the determination; (2) new and substantial evidence that could not have reasonably been discovered before the finding of responsibility was made; or (3) sanctions that are grossly disproportionate to the finding of responsibility. *Id*. Prior versions of the Code at least included an additional ground for appeal on the basis that the student believed the finding was arbitrary and capricious.

42.    Moreover, even if an appeal is allowed to proceed, the standard of review is exceptionally deferential to the investigator's findings and sanction and does not provide for meaningful review. The Code states that the appellate panel "will presume that decisions were made reasonably and appropriately, unless there is compelling information to the contrary. Appeals are not intended to be a rehearing of the matter." *Id*. For any avoidance of doubt regarding the slim chance of having an incorrect outcome or excessive sanction overturned, the Code states, "[t]he appellate panel will alter determinations of transgressions or consequences only where there is manifest error." *Id*.

43.    Thus, the appeals process is already stacked against an accused student, but incredibly, Tulane also puts its thumb on the scale. The Code allows the appellate panel to "speak to the investigator." *Id*. In reality, upon information and belief, the investigator participates in the appeal process by submitting a written response to the student's appeal, defending the process that she used and the outcome that she reached. Tulane and its investigator, therefore, essentially become a party to the appeal, with an interest in the outcome that is adverse to the accused student.

44.    As such, a student who believes he has been aggrieved by the process, the outcome, or the sanction, has little recourse. Indeed, the Code explicitly states: "Dissatisfaction with the results of a hearing is not itself a valid basis for appeal." *Id*. Ironically, there are no results of a hearing to be appealed – Tulane has eliminated hearing rights from the Code.

**The Diminution of Due Process Protections and the
Descent into Gender-Based Discrimination**

45.     The due process protections afforded by Tulane in the student disciplinary

process have not always been so lacking; they have steadily decreased over time. Prior to 2011,

for example, Tulane required that students accused of serious violations, such as sexual assault, be

found responsible under a clear and convincing evidence standard.

**External Pressure from the Federal Government**

46.     But beginning in 2011, the federal government put significant pressure on

colleges and universities to end sexual violence on campuses, which resulted in a reduction of

procedural rights for accused students and a prevalence of male students being found responsible

for sexual assaults they did not commit.

47.     In that regard, on April 4, 2011, the Office of Civil Rights ("OCR") of the

U.S. Department of Education ("DOE") issued a guidance letter to colleges and universities,

widely known as the "Dear Colleague Letter." The letter advised recipients that sexual violence

constitutes sexual harassment within the meaning of Title IX and its implementing regulations and

directed schools to "take immediate action to eliminate the harassment, prevent its recurrence, and

address its effects." Russlynn Ali, *Dear Colleague Letter*, U.S. Dept. of Educ. at 4 (Apr. 4, 2011),

*available at* http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf.

48.     The Dear Colleague Letter told schools to "minimize the burden on the

complainant" – for example, by transferring alleged perpetrators away from shared courses or

housing – and emphasized that schools should focus more on victim advocacy. *Id.* at 15-16. The

Dear Colleague Letter also emphasized that schools should adopt policies and procedures that

increased the likelihood that students would be found responsible, such as utilizing a relatively

low burden of proof – "more likely than not" – in cases involving sexual misconduct, including

14

sexual assault, and giving both parties the right to appeal, which amounts to the equivalent of double jeopardy for accused students. *See id.* at 11-12.

49.     Moreover, the DOE and OCR treated the Dear Colleague Letter as binding on regulated parties – which are all schools that receive any federal funding – and began pressuring colleges and universities to aggressively pursue investigations of sexual assault on campuses. On April 29, 2014, OCR issued additional directives to colleges and universities in the form of another guidance document. *See* Catherine E. Lhamon, *Questions and Answers on Title IX and Sexual Violence* ("Q&A"), U.S. Dep't of Educ. (Apr. 29, 2014), *available at* https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf.

50.     Like the Dear Colleague Letter, the Q&A was aimed at addressing educational institutions' sexual misconduct policies, including the procedures schools "must" have in place "to prevent sexual violence and resolve complaints." *See id.* at 9-10.

51.     Catherine Lhamon, former Assistant Secretary of the DOE in charge of its OCR, was clear about the federal government's expectations. In July 2014, Lhamon, when speaking at a conference on campus sexual assault, stated that she was prepared to cut off federal funding to schools that violate Title IX, and that she would strip federal funding from any college found to be non-compliant with the requirements of the Dear Colleague Letter. "Do not think it's an empty threat," Lhamon warned, adding: "It's not surprising to me that we haven't gone to the last step…It means that so far the process has been working." Meredith Clark, *Official to colleges: Fix sexual assault or lose funding*, MSNBC (July 15, 2014), http://www.msnbc.com/msnbc/campus-sexual-assault-conference-dartmouth-college.

52.     To support these initiatives and the goal of making the Dear Colleague Letter binding, OCR hired hundreds more investigators for Title IX enforcement and has since

"conducted 502 investigations of colleges for possibly mishandling reports of sexual violence," according to the Chronicle of Higher Education Title IX Tracker (available at https://projects.chronicle.com/titleix/).

53.     Moreover, revocation of federal funds – the ultimate penalty – is a powerful tool because institutions, both public and private, receive billions of dollars a year from the federal government. As Anne Neal of the American Council of Trustees and Alumni stated: "There is a certain hysteria in the air on this topic…It's really a surreal situation, I think." She explained that "schools are running so scared of violating the civil rights of alleged victims that they end up violating the due process rights of defendants instead." Tovia Smith, *How Campus Sexual Assaults Came to Command New Attention*, NPR (Aug. 12, 2014), *available at* https://www.npr.org/2014/08/12/339822696/how-campus-sexual-assaults-came-to-command-new-attention.

54.     At least as early as the 2014-2015 school year, Tulane substantially revised its student disciplinary procedures under the Code. Upon information and belief, the changes to the disciplinary process were a product of Tulane's attempt to align its procedures with federal Title IX directives in order to continue receiving federal funds.

55.     The 2014-2015 Code, and versions thereafter, contain significantly reduced procedural protections for accused students. For example, Tulane reduced the burden of proof from clear and convincing evidence to a preponderance of the evidence standard.

### Pressure from Students

56.     However, along with pressure from the federal government, Tulane was also being pressured by its own student community to respond aggressively to complaints of sexual assault and to mete out severe discipline to those found responsible for such acts.

57.     For example, in April of 2015, students participating in Sexual Awareness Month sent e-mails to Tulane's President, Michael Fitts, regarding what the students perceived as the administration's inadequate focus on the events planned for the month. The message the students sent was clear: "your failure to acknowledge the effort to fight sexual assault speaks to your inactivity and neglect to this issue that is plaguing Tulane University students." Brandi Doyal, *Students call for recognition for Sexual Awareness Month from the administration*, TULANE HULLABALLOO (Apr. 8, 2015), *available at* https://tulanehullabaloo.com/2107/news/students-call-for-recognition-for-sexual-assault-awareness-month-from-the-administration/.

58.     One student stated: "We want to call on Tulane University's administration to reform how they process sexual assault through Student Conduct, so that survivors are not left facing those who assaulted them every day on campus[.] [We need to] provide more sensitivity training with TUPD so they are working appropriately with survivors, putting them and their needs first." *Id*.

### Tulane Ratchets Up Gender-Biased Statements
### And Ratchets Down Due Process Protections

59.     With the backdrop of students openly expressing their displeasure with Tulane's "inactivity and neglect" around issues of sexual assault, Tulane hired a Title IX Coordinator, Meredith Smith. Upon information and belief, the decision to hire Ms. Smith was motivated by desire to quell student criticism that the University was not taking incidents of sexual violence seriously enough. Ms. Smith began her tenure as the Title IX Coordinator in 2016.

60.     At all times relevant to this litigation, Ms. Smith was responsible for overseeing Tulane's prevention of and response to sexual violence. Smith is a former Title IX investigator and a regular speaker on topics related to campus sexual violence against women and

victim's rights. Thus, she has a vested interest in appeasing the demands of student activists and ensuring that, under her tenure, Tulane appears tough on alleged sexual assailants.

61.    Upon information and belief, at the beginning of her tenure, Ms. Smith was instrumental in orchestrating Tulane's 2016 book project for incoming freshman, where all newly-admitted students are assigned a book to read over the summer for discussion in their seminar classes in the fall. The first book assigned under Ms. Smith's guidance was "Asking For It: The Alarming Rise of Rape Culture – and What We Can Do About It," by Kate Harding.

62.    Among the themes in Harding's book is the assertion that our current system of education focuses on "how women can avoid rape, not how men cannot rape," and the idea that because the media has to appear balanced, it "creates biases against women and perpetuates rape myths." *Tulane Reading Project Webinar on "Asking for It" by Kate Harding* (Aug. 17, 2016), *available at* https://www.youtube.com/watch?v=JQX2IN-nFmQ).

63.    Under Smith's leadership, Tulane's Title IX-related materials are rife with references to "rape culture," which is a term coined in the 1970s that is generally understood to describe the concept that society blames female victims of sexual assault and normalizes male sexual violence. The rape culture narrative, and Ms. Harding's book, emphasize that victims should be believed and eschew any form of what is considered victim-blaming.

64.    Ms. Smith organized a series of "Shifting the Paradigm" events on campus related to the book project, with workshops and presentations for students and administrators focused on topics such as Title IX, bystander intervention, and "gender-based sexual violence," culminating in Ms. Harding's lecture about her book and rape culture.

65.    Indeed, from 2016 to the present, Ms. Smith has regularly given presentations to the Tulane student and administrator community emphasizing that 1 in 5 women

will be sexually assaulted by the time they finish college, and that through Tulane initiatives such as "Shifting the Paradigm" and "Wave of Change," Tulane is committed to believing and supporting survivors, and to showing that sexual violence will not be tolerated.

66.     From the 2015-2016 school year to the present, each year, the number of complaints alleging sexual misconduct, the number of disciplinary proceedings initiated, the percentage of students found responsible, and the percentage of students who are suspended or expelled, have all increased dramatically.

67.     Moreover, upon information and belief, Tulane is initiating disciplinary proceedings against male students for sexual assault that the University previously would not have initiated, nearly all of the male students who are charged with sexual assault are found responsible, and nearly all of the male students found responsible for sexual assault have been suspended or expelled regardless of the particular circumstances of their case.

68.     Conversely, upon information and belief, Tulane routinely refuses to investigate or charge female students with sexual misconduct for violations such as nonconsensual sexual contact or stalking, and when female students are charged, nearly all are found not responsible, or are disciplined far less harshly than their male counterparts. In addition, upon information and belief, Tulane has on numerous occasions refused to investigate or charge conduct by female students that amounts to harassment or retaliation against accused male students.

### The Sexual Misconduct Climate Survey Sparks
### Further Pressure and Tulane Drastically Reduces its Due Process

69.     In the Spring semester of 2017, Tulane conducted a Sexual Misconduct Climate Survey ("Sexual Misconduct Survey") of its undergraduate and graduate students for the purported purpose of gauging the frequency and degree of sexual misconduct among the student population, motivated in part by a belief that sexual assault is underreported. Among other

problems, the Sexual Misconduct Survey utilized very broad definitions of the conduct it was seeking to measure, such as including any unwanted sexual touching in the definition of sexual assault, framed the survey questions in a highly-suggestive manner, and oversampled conduct by including misconduct that occurred anywhere or any time since the student had enrolled at Tulane. *See Tulane Climate Survey: Executive Report and Action Plan*, Tulane Univ. (Jan. 31, 2018), *available at https://tulane.edu/sites/tulane/files/WaveofChangeExecutiveReportActionPlan.pdf.* Ms. Smith helped to design the Sexual Misconduct Survey.

70.     Tulane did not release the data from the Sexual Misconduct Survey for nearly a year, until the Spring semester of 2018. In the interim, Tulane changed the Code again; indeed, the 2017-2018 version of the Code is a complete overhaul of the disciplinary process, with a dramatic downward departure from the already-inadequate due process protections contained in the previous version. Tulane eliminated all hearing board rights from its disciplinary process, replacing the right to a hearing – even in cases where students face suspension or expulsion – with the single investigator model. At the same time, Tulane restricted a student's appeal rights. The 2018-2019 Code, which applied to Doe's investigation and adjudication, is identical to the 2017-2018 version.

71.     John Doe and Jane Roe enrolled at Tulane as freshman during the 2017-2018 school year. During the Fall of 2017, Tulane students continued their activism on campus, pressuring the administration to take more aggressive action to end sexual violence, and becoming increasingly agitated that the University had yet to release the data from the Sexual Misconduct Survey. Finally, on January 31, 2018, Tulane released the data: the survey results concluded that an astonishing 41% of female undergraduate students had reported experiencing sexual assault

since enrolling at Tulane, and an astonishing 18% of undergraduate male students reported experiencing sexual assault since enrolling at Tulane.

72.     Continuing through the rest of the semester, Tulane rolled out its "Wave of Change" initiative aimed at changing the campus culture. Students pressed the administration to root out sexual misconduct by aggressively pursuing and punishing such behavior in all its forms, since the Sexual Misconduct Survey was an indication that the University's previous efforts had not been sufficient.

73.     For example, at a town hall event scheduled to announce the survey results, students angrily questioned President Fitts, Ms. Smith, and Tania Tetlow, the Senior Vice President and Chief of Staff to the President, about the University's plan to respond, and why the University was not doing more. Responses included: Ms. Smith stating that most of those found guilty are expelled; Ms. Tetlow stating, "We have no problem expelling people and we do not care about tuition money" and "Let's be clear: you will be punished if you violate someone else," while touting the increase in reporting numbers; and President Fitts stating that many assaults are never reported, but if students do make the decision to come forward, there will be swift action. *See* "Students press administration over release of sexual assault town hall results," Tulane Hullabaloo, January 31, 2018.

74.     The results of the survey are, indeed, disturbing; given the flaws in the survey, however, they are also likely inaccurate. *See Distorted Campus Assault Math*, THE WALL STREET JOURNAL (Feb. 8, 2018). By vastly overstating the problem, the University has amplified the anxiety and anger among the student body, exacerbating the impulse to overprosecute, while at the same time providing Tulane with a justification for depriving accused students of procedural protections.

**Tulane Refuses to Increase Procedural Protections
Or Reform its Conduct Process**

75.     Indeed, Tulane has doubled-down on its efforts to provide threadbare due process rights to accused students, even though the pressure has now been alleviated that the DOE is going to cut-off federal funding, and instead, the DOE and OCR under the current administration have encouraged schools to increase protections. For example, on September 7, 2017, DOE Secretary Betsy DeVos vowed to replace the "failed system," stating that "one person denied due process is one too many." Ms. DeVos continued, "Every student accused of sexual misconduct must know that guilt is not predetermined," and proclaimed, "any school that uses a system biased toward finding a student responsible for sexual misconduct also commits discrimination." *Secretary DeVos: Proposed Title IX Rule Provides Clarity for Schools, Support for Survivors, and Due Process Rights for All*, U.S. DEP'T OF EDUC. (Nov. 16, 2018), *available at* https://www.ed.gov/news/press-releases/secretary-devos-proposed-title-ix-rule-provides-clarity-schools-support-survivors-and-due-process-rights-all.

76.     On September 22, 2017, OCR withdrew the 2011 Dear Colleague Letter and the 2014 Q&A. In their place, OCR issued the "September 2017 Q&A on Campus Sexual Misconduct," which, among other things, prohibits universities from relying on fixed rules or assumptions that favor complainants over respondents. *See* https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf. The 2017 Guidance also requires that (i) a person free from actual or perceived conflicts of interest or biases lead sexual misconduct investigations; (ii) training materials and investigative or decision-making techniques that "apply sex stereotypes or generalizations" should be avoided to ensure a fair and impartial investigation; (iii) all rights and opportunities made available to complainants must be made

available to respondents; and (v) those issuing sanctions must consider the impact of separating a student from his or her education and the sanction should be proportionate to the violation.

77.     However, Tulane was resistant, issuing a statement from Ms. Smith and Ms. Tetlow to students and administrators on October 2, 2017 that the University had "concerns" regarding the DOE's "new guidance on campus sexual assault," and announcing the University's continued commitment to the original Dear Colleague Letter.

78.     Further, when the DOE published its notice of proposed rulemaking in November of 2018 to promulgate new Title IX regulations that would require additional procedural protections, such as the right to a hearing and the right to cross-examination conducted by the student's advisor, Tulane submitted a public comment in opposition to the proposed regulations.

79.     Thus, Tulane's resistance to providing adequate due process protections for investigations and adjudications of students accused of allegations that can only be characterized as quasi-criminal offenses, continues undeterred. Tulane has chosen, instead, to implement a process in which a single investigator acts as the prosecutor, jury, and judge with appellate "oversight" that is designed to make reversal as difficult as possible, and that is limited to very narrow grounds.

80.     Ironically, in Tulane's public comment opposing the Title IX regulations, while defending Tulane's current single investigator model, Ms. Smith hits on one of the problems with a single investigator selecting the evidence to include and then judging that evidence – an outcome-determinative procedural error that plagued this case and undermined all fundamental fairness. In criticizing the proposed regulation's requirement that schools provide "all gathered records to both sides" as an overly-broad edict that could lead to the production of irrelevant and confidential materials, Ms. Smith cautioned, "In our experience with investigations, students do

share an incredible amount of irrelevant information, perhaps intending to slip in prejudicial information that could cast the other party in a negative light. In particular, information about mental health, academic performance, and other misconduct is shared for the purpose of tipping the scales in one direction or another, and represents information that is not relevant, and more prejudicial than probative."

### Tulane's Mishandling of the Investigation and Adjudication of the Allegations Made Against John Doe

### John Doe and Jane Roe Become Friends and Engage in Consensual Sexual Activity

81.     John met fellow student Jane early in their freshman year and they became friends, which quickly turned into a consensual sexual relationship.

82.     The friendship and physical relationship lasted for a few months during the Fall of 2017. Eventually, John wanted a serious relationship with Jane, but she did not. The two began seeing each other less as the Spring semester approached.

83.     During the Spring of 2018, John and Jane remained friends, and would see each other around campus in class or at social events, but they no longer spent much time together.

84.     Also during the Spring of 2018, Jane's good friend, Witness 1, began reaching out to John and pursuing a sexual relationship with him. He was not interested at first, but the two became friends and eventually engaged in consensual sexual activity during that semester.

85.     Over the Summer, John and Witness 1 remained close and communicated regularly.

86.     Also during the 2017-2018 school year, John became good friends with Witness 2. At the end of the Spring 2018 semester, Witness 2 showed up to John's room one night

24

unannounced and took off all of her clothes and got in bed with him. John found the experience to be confusing and uncomfortable, but the two did not engage in sexual activity. Witness 2 became close friends with Jane, through mutual friend Witness 1, at the beginning of the 2018-2019 school year.

**John Doe's Relationship with Jane Roe Sours
and Her Friends become Angry with Him**

87.     Over the Summer, John attempted to reach out to Jane several times because he wanted to remain friends, but it became clear that she was mad at him. John did not know why Jane was upset with him, but assumed it was because of his relationship with Witness 1.

88.     Indeed, at some point, Jane had become aware of John's sexual relationship with Witness 1.

89.     Beginning as early as the Spring of 2018, Jane also believed that John had had a sexual relationship with at least one other woman in or around the same time as his sexual relationship with Jane. She discussed this issue with Witness 1, as well as other friends; although, Jane did not report this information to the Tulane investigator.

90.     After initially returning to school in the Fall of 2018, John and Witness 1 engaged in consensual sexual activity before most students had returned to campus for the semester.

91.     During September of 2018 after getting back to school, Jane reached out to John and the two began communicating again regularly and spending time together on occasion.

92.      At least as early as the beginning of the Fall 2018 semester, Jane's friends had decided that they did not like John and were angry at Jane for talking to him or hanging out with him. Jane was well-aware of how her friends felt.

**Jane Roe Initiates Sleeping Over in John Doe's Room
and Then is Embarrassed in Front of Her Friends**

93.     On September 29, 2018, Jane celebrated her 20th birthday, drinking all day with her friends. John was not present for those activities. She returned home around 11:30 pm and took the prescription drug Klonopin, a powerful sedative that amplifies the effects of alcohol. She then texted John to see if he wanted to watch a movie. John did not know, and had no way of knowing, that Jane had taken the medication or that she had been drinking that day.

94.     Jane arrived at the fraternity house where John lives around midnight. The two climbed in bed together and began watching a movie. John was wearing shorts with no shirt, and Jane was wearing pajama shorts and a tank top. The two kissed and cuddled as they watched the movie, but both soon fell asleep.

95.     In the morning, the two talked for a while as they laid in bed together, and then John asked Jane if she wanted him to perform oral sex on her since the day before had been her birthday, and she said "yes." After engaging in brief sexual activity, the two continued to talk and joke together, as John played his guitar.

96.     As Jane exited the fraternity house around noon, one of her friends noticed her location on Find My Friends, a program that allows you to track a friend's location, and sent a group text message to Jane and their mutual group of friends, which included Witness 1, saying: "[Jane Roe], what did you do last night?"

97.     Jane responded to the group text and reported that the night before she had taken a Klonopin and then John had texted her to ask if she wanted to come over and "smoke." She then stated that the two had proceeded to hang out until she fell asleep "and I'm pretty sure at one point I like hallucinated that there were like people in the room when there weren't." Then

Jane stated that she woke up in the middle of the night to John penetrating her with his finger "but like I couldn't move or like speak like idk if I was also hallucinating that but I'm p sure I wasn't."

98.    Witness 1 responded to the group text, saying "that's textbook assault." Jane went on to say that John thought she was asleep and continued to penetrate her with his finger and then put her hand on his bare penis and that she could not speak or move while this was occurring. Another friend then asked her if she wanted to report it, which Jane did not initially want to do, but then she stated "then I eventually just fully passed out again so I have no idea what happened after that," to which her friends encouraged her to have a rape kit processed.

99.    It is very clear from the text message chain that Jane's friends do not like John. And at no time did Jane report to the group that she and John had engaged in oral sex in the morning, which is the only sexual activity that both John and Jane agree occurred (but which Jane later told Tulane's investigator was nonconsensual).

100.    Moreover, from the very beginning, Jane lied to her friends about why she had gone to John's fraternity house that night, claiming that she had gone there to smoke marijuana rather than admitting to them that she had initiated going to his room because she wanted to watch a movie with him. When asked about this by the investigator (at John's insistence), Jane stated, "…they don't like [John Doe] and have been angry with me for speaking to him or hanging out with him…so I figured if I said he invited me over to smoke they would be more understanding, as it is more social and casual than watching a movie because of the 'Netflix and Chill' stigma."

101.    As explained herein, none of Jane's credibility issues or inconsistent statements were sufficiently probed or given any weight by the investigator, who was predisposed to believe Jane and to disbelieve John.

102.    After leaving the fraternity house and texting with the group, Jane met with two friends for coffee around noon on September 30, 2018 – one who had been on the group text chain, Witness 3, and one who had not, Witness 4. Jane described the encounter to Witness 3 and Witness 4 in similar terms to what she had described on the group text, and Witness 3 and Witness 4 encouraged Jane to have a rape kit processed because Jane was not lucid enough to know exactly what had happened. Jane did not tell Witness 3 and Witness 4 that she and John had engaged in oral sex, whether consensual or nonconsensual, in the morning.

103.    After some discussion of needing to have a rape kit performed in order to know what happened, and needing to report the incident in order to prevent him from doing it to someone else in the future, Witness 3 and Witness 4 convinced Jane, and Witness 4 accompanied her to the hospital for the purpose of a rape exam. Later that day, Jane submitted a campus reporting form alleging that John had engaged in sexual misconduct. She also failed to mention that the two had engaged in oral sex on the campus reporting form.

104.    Both Witness 3 and Witness 4 were later interviewed by the investigator, one month and two months after the incident, respectively. The procedure for such interviews is that the investigator then sends a description of the statements made during the interview to the "witness" for their verification and approval. Neither Witness 3 nor Witness 4 ever verified their statements, despite request to do so; nevertheless, the investigator included the statements in the investigation report and relied upon them heavily.

**Jane Roe Accuses John Doe of Nonconsensual Sexual Contact
and the Botched Investigation Begins**

105.    The day after Jane submitted the campus reporting form, Tulane issued a mutual "no contact" order to both John and Jane. The mutual "no contact" order, issued by Erica Woodley, Assistant Vice President of Student Affairs, prohibited either John or Jane from

28

contacting or communicating with the other, whether directly or through third parties. Upon information and belief, ordinarily when Tulane receives a complaint of sexual misconduct that University officials believe could be seriously threatening to the complainant or the Tulane community, Tulane issues a "no contact" order to the accused student only, not a mutual "no contact" order to both students.

106.    On October 3, 2018, Dr. Zacharda, the Director of Student Conduct, met with John for a "procedural review," wherein the student is given a copy of the written Procedural Protections for Responding Student, which both he and the Director of Student Conduct sign ("Procedural Protections"). *See* Ex. "B," attached hereto.

107.    Also on October 3, 2018, Dr. Zacharda sent a Notice of Investigation and Charges letter to both John and Jane. The University deems this letter a confidential communication. The letter indicated that the University would investigate a charge of "Sexual Assault – Sexual Contact" and that if additional or different conduct charges were identified during the process, John would be notified of those charges "during conduct meetings, official reports, and/or other methods as deemed appropriate. John was never informed at any time during the process that additional or different conduct charges were being investigated or charged.

108.    Initially, the investigation was assigned to Investigator Lex Kelch-Brickner. The same day that John and Jane received the confidential Notice of Investigation and Charges, Jane disseminated the letter the letter to third parties – friends of hers both at Tulane and outside of the University. Indeed, John was informed of the dissemination by a friend from high school who was attending a university in Texas. John and his advisor, a Tulane faculty member, immediately informed Dr. Zacharda and Ms. Kelch-Brickner of the confidentiality breach, and the University issued a cease and desist order to Jane the same day.

109.    The cease and desist order states, "The conduct system is built on an expectation of privacy and confidentiality. Furthermore, depending on the recipient, this may be a violation of the existing no contact order." In that regard, the "no contact" order states, "A violation of this 'no contact' order could result in an immediate interim suspension and a charge of violating the Code of Student Conduct. Moreover, the Code's promise that the University will "safeguard the privacy of individuals involved in a manner consistent with applicable law and the Tulane Code." See Ex. "A," at Sec. VI.E. In addition, the Procedural Protections guarantee that the accused student "will receive reasonable protection from retaliation, intimidation, or harassment" based upon his participation in the process.

110.    Notwithstanding, Tulane never investigated Jane's conduct, including to whom the information was disseminated, whether Jane or others acting on her behalf actually ceased disclosing confidential communications, or whether she should be charged with violating the Code.

111.    Tellingly, the investigator also did not even consider Jane's actions in the context of the investigation of John's allegedly inappropriate behavior and whether those actions cast doubt on her credibility. Considering the evidence gathered during the investigation showing that Jane and her friends were angry with John, the immediate distribution of the confidential charge letter should have indicated a possible motive to retaliate against him and damage his reputation, which should have been weighed in assessing her credibility.

112.    Instead, the investigator did not even reference Jane's improper actions in the material facts she included in the investigation report. In concluding that Jane's account was "more credible" than John's, there is also no indication that the investigator probed this issue,

finding instead that "there was no evidence or information provided to discredit one person's account over the other."

113.    On October 10, 2018, Jane met with Ms. Kelch-Brickner for her investigation interview. For the first time, Jane reported that she and John had engaged in oral sex on the morning of September 30, 2018. Ms. Kelch-Brickner's description of Jane's statements regarding the incident states, "[John] persisted and then physically began performing cunnilingus. [Jane] told [John] to stop, and he complied."

114.    Jane also told Ms. Kelch-Brickner that "shortly after the incident," Witness 2 had told her that one night during the 2017-2018 school year, Witness 2 had been in John's room – which the investigation later revealed that the night in question was the night when Witness 2 removed all of her clothing in John's room – and John had pressured Witness 2 to perform oral sex on him without her consent. As explained herein, although this allegation should have been excluded under the Code as evidence of prior sexual activity with a third party, it was instead a focus of the investigation.

115.    Jane also discussed Witness 1 with Ms. Kelch-Brickner, including the fact that Jane had learned during the 2017-2018 school year that Witness 1 and John had had a sexual relationship at the same time John and Jane were having a sexual relationship. Jane did not report that Witness 1 had told her that during the 2017-2018 school year, John had engaged in nonconsensual sex with Witness 1 while Witness 1 was asleep. Like Witness 2's accusation, Witness 1's accusation became a focus of the investigation of the entirely unrelated incident between John and Jane. Further, Jane later stated that she had learned of Witness 1's claims a few days after the September 30, 2018 incident; yet, Jane did not mention the claim in her investigation interview with Ms. Kelch-Brickner.

31

116.    The next day, on October 11, 2018 – after having participated in critical events of the investigation, such as the decision to issue a cease and desist order and the initial interview of the complainant – Ms. Kelch-Brickner recused herself from the investigation "to avoid actual or perceived conflict of interest." Neither John nor his advisor were ever informed of the reason for the recusal. Notwithstanding, the investigation report included and relied upon the interview statement drafted by Ms. Kelch-Brickner – an interview that was apparently conducted under the influence of an actual or perceived conflict of interest.

117.    The case was then assigned to Investigator Dawn Broussard. Ms. Broussard conducted the remainder of the witness interviews, drafted the investigation report to include the evidence that she in her sole discretion determined was relevant, concluded that John was responsible for sexual assault, and decided to sanction John with a two and a half year suspension.

118.    In so doing, Ms. Broussard improperly shifted the burden of proof to John to prove his innocence. She ignored inconsistencies in Jane's statements, and amplified purported inconsistencies in John's. She further chose to weigh all credibility determinations in favor of Jane, and against John, even when there was countervailing evidence on both side.

119.    For example, Ms. Broussard did not even consider, and nowhere in the material facts in her investigation report did she include, the that fact that Jane had been drinking and taking prescription medication prior to the incident, and that she had reported to her friends that she may have been hallucinating during the night. Thus, Ms. Broussard did not even consider the very-real possibility that Jane may have dreamt or otherwise hallucinated the unwanted touching.

120.    She also did not consider credibility issues regarding Jane's motive and whether the allegations were the product either of a desire to retaliate against John for his

relationship with Witness 1 or other women, or a desire to cover up her interaction with, and subsequent engagement in consensual sexual activity with, a person whom her friends did not approve. Similarly, Ms. Broussard did not consider whether Witness 1's uncorroborated accusations were motivated by a desire to retaliate against John, or distance herself from a person who had caused friction in her friendship with Jane, especially since the investigation revealed that Witness 1 and John had engaged in sexual activity, again, just weeks before the incident, but it is not at all clear whether Jane was aware of the recent rendezvous.

121.    Further, Ms. Broussard discounted Jane's inconsistent statements made contemporaneously to her friends regarding the reason she had gone to John's residence and failing to reveal that the two had engaged in oral sex, while at the same time, holding against John what the investigator perceived as an omission on his part in failing to mention that he had also briefly penetrated Jane with his finger the morning of September 30, 2018 while engaging in oral sex. In reality, there was no omission – it was part of the same sexual act, which John, but not Jane, admitted to from the beginning.

122.    Thus, Ms. Broussard failed to faithfully apply the preponderance of the evidence standard. As explained herein, she further evidenced bias throughout the investigation, and in the selection of material facts she chose to include, and not to include, in her investigation report.

123.    Upon information and belief, Ms. Broussard has found every male, or nearly every male, that she has investigated for sexual assault responsible. Ms. Broussard has also consistently refused to investigate wrongdoing perpetrated by female students that is revealed during an investigation.

### The Investigator Embarks on a *De Facto* Investigation of
### Unrelated Conduct, without Notice of Additional Charges

124.    During the investigation, Ms. Broussard focused heavily, and questioned witnesses extensively, on accusations of sexual misconduct that were unrelated to Jane's allegations. The degree to which this undermined fundamental fairness cannot be overstated because the accusations were both irrelevant and highly-prejudicial.

125.    For example, Ms. Broussard spent an inordinate amount of time probing the unrelated accusations of Witness 1 and Witness 2, which Ms. Broussard appears to have credited. However, rather than conducting an unauthorized *de facto* investigation of uncharged conduct, under the Code, Ms. Broussard should have excluded this evidence.

126.    Ms. Broussard also questioned witnesses at length about peripheral claims of untoward sexual behavior that emerged during the investigation. In particular, after Jane mentioned that John had sent unsolicited naked photographs to her and her friends, Ms. Broussard questioned John and other witnesses extensively about such conduct. However, even if true, such behavior bears no resemblance to the conduct for which John was being investigated so as to constitute "pattern evidence," or anything else of probative value.

127.    Moreover, whereas under the Code, these allegations of John's prior sexual history and unrelated sexual conduct with third parties should have been "evidence" that was excluded from the investigation, Ms. Broussard specifically included all of these allegations in the witness statements and material facts that she chose to include in her investigation report.

128.    Indeed, rather than exercising proper investigatory discretion and excluding this evidence, Ms. Broussard appears to have embarked on an unannounced investigation of uncharged conduct. John was never informed that he was being investigated for these unrelated allegations, but they appear to have played an outsized role in the investigation.

129.     In that regard, Ms. Broussard spent weeks soliciting this information through multiple interviews with Witness 1 and Witness 2, and multiple rounds of interviews and follow-up questions with John regarding allegations about which he was never charged, and to which he was not prepared to respond. For example, when first confronted with Witness 1's allegation that he had engaged in nonconsensual sex with her during the 2017-2018 school year – which Ms. Broussard first brought to John's attention nearly two months into the investigation – John denied the allegation and "added that this was the first time he'd heard anything about [Witness 1's] concerns. He stated that this was surprising to him as the two were 'really close' over the following summer, talking, texting, or Snapchatting every day."

130.     In addition, Ms. Broussard improperly considered and included in the investigation report uncorroborated, general character evidence that cast John in a negative light. This included statements from Witness 1, Witness 2, Witness 3, and Witness 4, such as that John was known for sending unsolicited naked photographs, that John was involved with a lot of other women at the same time he was involved with Jane, and that John's fraternity is commonly known nationally for sexually assaulting women.

131.     Most importantly, Ms. Broussard's solicitation, consideration, and inclusion of highly-prejudicial, unrelated allegations appears to have tainted the outcome. These statements and accusations factor prominently in her investigation report and she utilizes them as a justification for the disproportionate sanction. Indeed, the prejudicial effect of these accusations on Ms. Broussard was not lost on John, who sent Ms. Broussard a letter after the meeting in which she first revealed Witness 1 and Witness 2's claims, stating, "[A]fter our meeting on Monday, November 26, 2018 in your office, I felt that you had already made a decision in my case based

on the collaborated stories of three fellow students. I don't know what more I can do to prove every encounter with the two of them was consensual."

### The Investigation Concludes with an Incorrect Finding of Responsibility and an Extremely Harsh Punishment

132.    Given the limited due process protections inherent in Tulane's Code, and the many procedural errors in this case, not surprisingly, Ms. Broussard found John responsible for sexual assault.

133.    On February 11, 2019, Ms. Broussard issued her final investigation report, containing, among other things, a recitation of the timeline and material facts of the investigation, conclusions regarding the charged conduct, and the sanction to be imposed (the "Final Investigation Report").

134.    Ms. Broussard found that Jane's account was "more credible" than John's, and that it was "reasonably more likely" that John had engaged in nonconsensual sexual touching. Interestingly, Ms. Broussard did not find John responsible for engaging in oral sex without Jane's consent, concluding that there was not enough evidence for the allegation. Notwithstanding, John was found responsible for Sexual Assault – Sexual Contact.

135.    In addition, Ms. Broussard issued an extremely harsh sanction – suspension effective immediately and continuing through May of 2021, when John was otherwise expected to graduate – considering the nature of John's alleged conduct and the fact that he has no prior disciplinary record.

136.    Further, it is clear that the improper character evidence and accusations of his prior sexual behavior and sexual history with third parties heavily influenced the sanction. Specifically, Ms. Broussard stated that the "severity of these behaviors paired with similar allegations from other women speaks to a pattern of behavior on his part." And while Ms.

36

Broussard conceded that "the additional allegations against [John Doe] have not been thoroughly investigated and he has not been found responsible for any misconduct related to those allegations," she justified the harsh punishment and lengthy suspension on these unproven allegations, concluding that "this pattern of behavior suggests that [John Doe] may be a threat to the women who participated in this investigation, all of whom will likely be students at the University until the end of the 2020-2021 academic year, as well as the broader Tulane community."

137.    Moreover, notwithstanding the Code's assurances that investigative findings are "subject to substantial review," the Final Investigation Report was sent to Dr. Zacharda, the Director of Student Conduct, and Ms. Smith, the Title IX Coordinator, to "review" on the very same day that the Final Investigation Report was completed and released. The Final Investigation Report is 83 pages, much of which is single-spaced; accordingly, there is simply no possibility that Dr. Zacharda or Ms. Smith exercised any meaningful review of the Final Investigation Report in less than one day, in order to ensure fundamental fairness, or to comply with Tulane's obligations under the Code.

138.    A copy of the Final Investigation Report was provided to John and Jane, and their respective advisors, on February 11, 2019 for viewing via Tulane's electronic system. Documents cannot be copied or printed from the electronic system.

### The Investigator Improperly Changes her Final Investigation Report and the Appeals Panel Rubberstamps her Decisions

139.    Undersigned counsel requested a copy of the Final Investigation Report through the Office of Tulane's General Counsel in order to assist John in preparing his appeal. Tulane responded that the Final Investigation Report would first need to be redacted to remove student names before it could be released.

37

140.    Incredibly, on March 8, 2019, when Doe and his counsel received the redacted report, it had been materially altered (the "Redacted Report"). Upon information and belief, Ms. Broussard altered the report.

141.    Substantial revisions include an addition to the investigation timeline that on October 11, 2018, Ms. Broussard informed Doe of an "additional conduct charge of sexual harassment." There is no corresponding entry in the Final Investigation Report. Moreover, at no point in the investigation were Doe or his advisor notified in any manner that sexual harassment had been alleged, charged, or was under investigation.

142.    Most notably, the Redacted Report states that Doe was found responsible for two separate violations of the Code: "Sexual Assault – Sexual Contact" and "Sexual Assault – Sexual Intercourse." Doe was never notified that he had been charged with, or was being investigated for, any additional or different conduct charge, as required by the Code or any standard of due process, and as promised by the Notice of Investigation and Charges.

143.    Upon information and belief, Ms. Broussard changed the report in order for the conduct charged and findings of responsibility to sound more egregious for the purpose of further tainting the appeal process and increasing the likelihood that the appeal would be denied.

144.    In addition, under the Code, both the complainant and the respondent are given an opportunity to review a draft of the investigation report before it is finalized and are permitted to submit comments to the investigator. That right is extremely limited because at that late stage of the process, after the investigator has already gathered all of the evidence that she intends to gather and has already reached her conclusions regarding that evidence, it is highly unlikely that a student's comments to the draft will alter the outcome or the sanction. But here, Doe was deprived of even that limited right because he never saw the Redacted Report and the

changes that were made after the investigation was completed. Therefore, he did not have an opportunity to address the issue with Ms. Broussard that he was never charged with Sexual Assault – Sexual Intercourse.

145.    Doe submitted his appeal request on March 18, 2019 (the "Appeal"). The Appeal was based on the following grounds: (1) procedural errors occurred that were material deviations from the applicable procedures and substantially impacted the determination of responsibility and the sanction; and (2) the sanction imposed was grossly disproportionate to the finding of responsibility.

146.    The procedural errors articulated in the Appeal included, but were not limited to: (1) the investigator substantially and retroactively changing the Final Investigation Report; (2) the investigator improperly relying on character and reputation evidence regarding Doe's unrelated sexual history with third parties; (3) the inclusion of materials drafted by an investigator who subsequently recused herself due to a conflict of interest; (4) the investigation and material facts recited in the report demonstrating the investigator's bias and inability to remain impartial; and (5) the investigation and report demonstrating that the investigator improperly shifted the burden of proof to Doe to prove his innocence.

147.    Upon information and belief, Ms. Broussard submitted a response to the Appeal to the appeals panel, arguing that no procedural errors had occurred, and defending her actions taken and decisions made throughout the investigation and adjudication process.

148.    Tulane summarily denied the Appeal with regard to the finding of responsibility and upheld the finding.[4] No reasoning or rationale was provided. With regard to the

---

[4]      Curiously, the one-sentence notice of the outcome regarding the finding states that the "original" finding of responsibility was upheld, and the letter identifies that finding as Sexual Assault – Sexual Contact. There is no mention of the additional finding of responsibility that Ms. Broussard added to the Redacted Report for Sexual Assault – Sexual Intercourse. Tulane, therefore, seems to tacitly acknowledge the impropriety of the added charge and finding of

sanction, Tulane found the Appeal to be "meritorious," but then proceeded to modify the suspension by reducing it by only one semester. Further, Tulane initially decided to impose the suspension with an immediate effective date, even though there were only two weeks of classes remaining before exams, and forcing Doe to withdraw mid-semester would have resulted in him receiving no credits for the semester. It was only after Tulane was threatened with a temporary restraining order that the University eventually relented. Doe remained on campus and in his classes for the remainder of the semester, without any additional restrictions, and without incident.

149.    Notwithstanding, Tulane's decision is now final, and the University will impose its suspension on Doe begin with the Fall 2019 semester and continuing for the following three semesters until January of 2021.

**Damages**

150.    Due to the acts and omissions set forth above, if Tulane's erroneous decision is not rectified, Doe will sustain extensive damages, including but not limited to a permanent notation of sexual assault on his educational records, which will severely compromise his education and career prospects, including his ability to gain admission to graduate school or to become a licensed professional.

151.    Additionally, as a result of Tulane's actions and inactions, Doe has suffered psychological, emotional, and reputational damages. Doe's grades have suffered as a result of Defendant's wrongful actions and the stress that he was forced to endure when faced with false allegations and navigating an unfair process. The timing of Defendant's actions and the uncertainty that it has caused, including whether Doe can return to Tulane in the Fall, have only increased the

---

responsibility; however, the inclusion of a far more serious conduct violation in the Redacted Report undoubtedly colored the appeal process and contributed to Tulane's continued insistence on imposing a disproportionate sanction.

stress and anxiety that Doe was already experiencing. The lasting effects of the stress, anxiety, and depression will impact Doe's life and ability to succeed in school for years to come.

### Irreparable Injury

152.     Absent an injunction preventing Defendant from imposing the suspension and interrupting his education, Doe will suffer irreparable harm. Doe expected to graduate from Tulane – the school that he has always wanted to attend – in May of 2021. Now, he has been suspended until January of 2021 and is not permitted to transfer in any credits taken at another university during his suspension. As a result of Tulane's actions, Doe's education will be improperly interrupted – possibly for one and a half years.

153.     Moreover, given the timing of the suspension so late in the semester, it will be difficult for Doe to secure admission to another institution, depriving him of a meaningful opportunity to mitigate the interruption and transfer. And given the extremely damaging notation in Doe's disciplinary record that he has been found responsible for sexual assault, Doe will never be able to attend a school of similar quality to Tulane. Without immediate and appropriate redress, the incorrect and unfair outcome of Tulane's disciplinary proceeding will, therefore, irreparably harm Doe by interrupting his education and/or preventing him from completing his education at Tulane, and the attendant loss of future education and employment opportunities that will inevitably result therefrom. There is no adequate remedy at law for these injuries.

### CLAIMS FOR RELIEF

### COUNT I
### Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.* – Erroneous Outcome

154.     The allegations of Paragraphs 1 through 153 are incorporated herein by reference, as if set forth in their entirety.

155.    Title IX of the Education Amendments of 1972 provides, in relevant part, that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

156.    Title IX applies to all public and private educational institutions that receive federal funding, which includes Tulane.

157.    Among other things, Title IX bars the imposition of university discipline where gender is a motivating factor in the decision to discipline.

158.    An erroneous outcome occurred in this case because John Doe was wrongly found to have committed sexual assault, and gender bias was a motivating factor.

159.    The erroneous outcome in this case was the product of Tulane's inherently flawed process that is insufficient to ensure fundamental fairness, coupled with the procedural errors in this case and deviation from the applicable policies, which significantly exacerbated the fundamental flaws in Tulane's system of investigation and adjudication.

160.    From the outset, Tulane's existing policies and procedures are not adequate to ensure that students accused of serious, quasi-criminal conduct are treated with fundamental fairness because Tulane relies solely on a single investigator to investigate and adjudicate such cases. *See, e.g., Doe v. Brandeis Univ.,* 177 F.Supp.3d 561, 606 (D. Mass. 2016) ("The dangers of combining in a single individual the power to investigate, prosecute, and convict, with little effective power of review, are obvious. No matter how well-intended, such a person may have preconceptions and biases, may make mistakes, and may reach premature conclusions.").

161.    Tulane's existing policies and procedures are further fundamentally unfair in the following non-exclusive ways: the absence of any right to a hearing, the inability to

42

adequately confront or cross-exam your accuser or other material witnesses, the lack of meaningful appeal rights, and the lack of sufficient oversight and review by University officials of the investigator's decisions regarding both the outcome and the sanction.

162.    Here, the process that Tulane actually employed, often in violation of its own Code, further undermined the fairness of the investigation and adjudication, contributing significantly to the erroneous outcome. The procedural errors include but are not limited to: improperly considering irrelevant and highly prejudicial character and reputation evidence and allegations of unrelated sexual history with third parties, lack of adequate notice of the conduct under investigation, failure of the investigator to remain unbiased and impartial, failure to faithfully apply the preponderance of the evidence standard, and altering the investigation report after the investigation was completed and the parties could no longer comment on the report. *See, e.g., Doe v. Rollins Coll.*, 352 F.Supp.3d 1205, 1207 (M.D. Fla. 2019) (specifically criticizing the Title IX investigator's report, because it "did not tell the whole story. Instead, it included a number of irrelevant, inflammatory, and conclusory statements about Plaintiff—crediting the testimony of Roe's witnesses over Plaintiff's while making untoward editorial comments about Plaintiff's prior sexual history. Further, even though the report acknowledged conflicting testimony and no additional eyewitnesses, [the investigator] provided a credibility assessment of both actors—Jane Roe was credible but Plaintiff was not.").

163.    In addition, the totality of the circumstances demonstrates that gender bias was a motivating factor in Defendant reaching the erroneous outcome in this case. In that regard, Tulane has demonstrated a pattern of inherent and systematic gender bias and discrimination against male students accused of sexual misconduct, and in particular, against those accused of sexual assault. *See Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994) (finding that the

"particular circumstances suggesting that gender bias was a motivating factor" in a university's disciplinary decisions include "statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender").

164.     For example, Ms. Smith and other University officials have made statements that evidence and perpetuate the idea that males are aggressive and are the perpetrators of sexual violence. University officials have consistently emphasized to students and administrators that our society is plagued by a rape culture, in which female victims are blamed or disbelieved, and male sexual violence is normalized. With this backdrop, Tulane has vowed to believe those who report sexual assault and to end sexual violence on campus, which has led to the overprosecution of male students and extremely harsh sanctions for male students who are found responsible.

165.     Moreover, beginning in or around 2014, Tulane faced external pressure from the federal government to crack down on sexual assault and sustained criticism from student activists that the University was not doing enough to combat sexual violence on campus. As a result, Tulane significantly reduced the due process protections for accused students in its disciplinary process, and hired Ms. Smith as its Title IX Coordinator.

166.     Upon information and belief, Ms. Smith and other University officials then instituted Title IX sexual assault training for Tulane administrators, including those who serve investigative and adjudicative roles in the disciplinary process, based on the premise that males are perpetrators of sexual assault and females are victims. Such training materials, along with presentations by Ms. Smith and others, instruct investigators that victims must be believed and

admonish investigators not to appear skeptical of a complainant's story because then she might not cooperate with the investigation.

167.    Consequently, since Ms. Smith began her tenure as Tulane's Title IX Coordinator, the number of disciplinary proceedings initiated, the percentage of students found responsible, and the percentage of students who are suspended or expelled, have all increased dramatically.

168.    Moreover, upon information and belief, Tulane has treated males accused of sexual misconduct differently and more harshly than it has treated females accused of sexual misconduct, both in the disciplinary process and in the sanction meted out.

169.    In that regard, upon information and belief, Tulane is initiating disciplinary proceedings against male students for sexual misconduct that the University previously would not have initiated, nearly all of the male students who are charged with sexual misconduct, and in particular sexual assault, are found responsible, and of those nearly all have been suspended or expelled regardless of the particular circumstances of their case.

170.    Conversely, upon information and belief, Tulane routinely refuses to charge female students with sexual misconduct for violations such as nonconsensual sexual contact or stalking, and when female students are charged, nearly all are found not responsible, or are disciplined far less harshly than their male counterparts.

171.    In particular, upon information and belief, investigations and adjudications led by the investigator in this case, Ms. Broussard, reflect gender bias in the decisions of what to investigate and what evidence is relevant to the investigation, and lead to erroneous outcomes and disproportionately harsh punishments for male students.

172.    Further, Tulane has perpetuated its gender bias and discrimination against male students through actions such as its Sexual Misconduct Survey, which reinforced the narrative that female students are victims of sexual assault at the hands of male perpetrators, and reinforced the notion that Tulane was not doing enough and the University needed to aggressively prosecute and severely sanction students accused of sexual misconduct. As a result, the University, once again, dramatically reduced the due process protections in the Code.

173.    The 2017-2018 changes to the Code came as John Doe and Jane Roe were beginning their studies at Tulane. Also in 2018, Tulane students were predictably outraged by the results of the Sexual Misconduct Climate Survey, and increased their demands that Tulane respond aggressively to allegations of sexual misconduct. Ms. Smith, President Fitts, and other University officials reacted by promising that swift action will be taken when students come forward with allegations and that Tulane is committed to ending its rape culture. Upon information and belief, pressure from students has not subsided, nor has the University's desire to appease students and to appear to the community that Tulane is tough on sexual misconduct.

174.    Amid this fury, Jane Roe came forward with her allegations against John Doe, the investigation of which then spiraled into unrelated accusations of other women, which were not officially charged or thoroughly investigated but, nonetheless, heavily influenced the outcome. The handling of his case demonstrates gender bias, and combined with Tulane's history of harshly disciplining male students and recent pressure to increase such efforts, shows that Tulane's decision to discipline John Doe was motivated by gender bias.

175.    Defendant's violation of Title IX proximately caused injury to John Doe, including emotional distress, damage to reputation, loss of educational opportunities, and loss of future employment opportunities.

176.     As a result of the foregoing, Doe is entitled to recover damages in an amount to be determined at trial, including interest, costs, and attorneys' fees.

## COUNT II
### Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.* – Selective Enforcement

177.     The allegations of Paragraphs 1 through 176 are incorporated herein by reference, as if set forth in their entirety.

178.     The decision to initiate disciplinary proceedings in this case, and the severity of the punishment imposed on John Doe, were motivated by gender bias.

179.     In that regard, Tulane's Title IX coordinator, whose statements and actions over the years have exhibited gender bias against males, is involved in the gatekeeping function of deciding what disciplinary proceedings to initiate. Moreover, there are no parameters in the Code as to what conduct may constitute a "major matter" that could warrant suspension, and therefore, the decision of whether to initiate an investigation is entirely within the discretion of the Director of Student Conduct and the Title IX coordinator. Such a system leads to the selective initiation of disciplinary proceedings against male students.

180.     In addition, the decision of whether to initiate a proceeding, and what type of proceeding to initiate, is determined by these University officials first deciding what punishment they think the alleged conduct could warrant. Therefore, before any investigation has begun, and indeed, before the University has even talked to the accused student, the case is pre-judged. Bias and a lack of impartiality is, therefore, built into the system because the same officials who have pre-judged the case are the ones who are supposed to provide oversight and review to the process, leading to selectively extreme sanctions.

181.    Tulane has a history of refusing to investigate wrongdoing alleged by male students against female students. For example, Tulane has refused to investigate allegations by male students that female students have breach the confidentiality of the conduct process and retaliated against male students, or otherwise acted to intimidate or harass them, during student conduct investigations. *See e.g., Doe v. Tulane University*, Case No. 17-12081, E.D.La, Rec. Doc. 20, at pp. 18-19 (alleging that Ms. Broussard and the former Director of Student Conduct refused to take any action when male student reported that female complainant had retaliated against him and breached the confidentiality of the process by spreading rumors about the "rape charge").

182.    Here, when John Doe made similar allegations against Jane Roe, the University issued a cease and desist letter to Jane, but then did nothing else to investigate or discipline the incident, or even to ensure that the cease and desist order was being followed. Thus, Jane's actions to harass John and retaliate against him and damage his reputation went uninvestigated, uncharged, and unpunished.

183.    Upon information and belief, Tulane also has a history of refusing to investigate or charge stalking allegations made by male students against female students, but routinely investigates and charges stalking allegations made by female students against male students.

184.    Further, John Doe was accused of nonconsensual sexual touching. Upon information and belief, Tulane routinely refuses to initiate an investigation of female students who are accused of nonconsensual sexual touching. In addition, upon information and belief, when female students are found responsible for nonconsensual sexual touching, Tulane does not suspend them or sanction them as harshly as Doe was punished in this case.

185.    Upon information and belief, Ms. Broussard, in particular, has a history of refusing to investigate allegations of stalking and nonconsensual sexual touching, or other wrongdoing perpetrated by female students, when such allegations arise during an investigation.

186.    Further, upon information and belief, Ms. Smith, Ms. Broussard, and other Tulane officials have a history of recommending disproportionately harsh sanctions when the accused is a male, as compared to females accused of sexual misconduct.

187.    The decision to initiate an investigation in this case, and the severity of the penalty imposed on Doe were, therefore, motivated by gender bias and were the product of this selective enforcement.

188.    Defendant's violation of Title IX proximately caused injury to John Doe, including emotional distress, damage to reputation, loss of educational opportunities, and loss of future employment opportunities.

189.    As a result of the foregoing, Doe is entitled to recover damages in an amount to be determined at trial, including interest, costs, and attorneys' fees.

## COUNT III
## Breach of Contract

190.    The allegations of Paragraphs 1 through 189 are incorporated herein by reference, as if set forth in their entirety.

191.    Doe applied to and enrolled in the University and paid the associated tuition and fees, and in return, the University contracted to provide Doe access to its undergraduate degree program. Doe did so with the understanding and reasonable expectation that Tulane would apply and enforce the policies and procedures set forth in its official publications, including the Code.

192.    The relationship is, therefore, contractual in nature, and Tulane's official publications and written policies servs as evidence of the contract between the parties.

49

193.    Moreover, Tulane is bound by, and obligated to follow, its written policies and procedures, including those contained in the Code and the Procedural Protections document that Tulane provides to accused students.

194.    Defendant breached its contract with Doe by failing to comply with its obligations and follow its written policies and procedures during the investigation and adjudication process.

195.    A non-exhaustive list of Defendant's breach of its obligations under the Code and the Procedural Protections, among other documents, include but are not limited to: inadequate notice of the conduct under investigation; failure to conduct a neutral and fair investigation with no presumptions of wrongdoing; failure to provide a fair and reliable gathering of the facts by an impartial investigator; failure to exclude irrelevant and prejudicial evidence that the Code defines as evidence that will not be considered; failure to investigate Roe's conduct in disseminating confidential communications and whether it had violated Doe's rights; failure to correctly and impartially apply the preponderance of the evidence standard; failure to provide Doe with an opportunity to review and comment on the Redacted Report, which became the revised final investigation report; failure to subject the investigative findings and sanction to substantial review by any Tulane official.

196.    In addition, Tulane is obligated to make its disciplinary decisions in a manner that is neither arbitrary nor capricious. The Louisiana Supreme Court has defined "capricious" as a "conclusion made without substantial evidence or a conclusion contrary to substantial evidence" and "arbitrary" as a word that "implies a disregard of evidence or of the proper weight thereof."

197.    Tulane's decision to suspend Doe was made without substantial evidence of probative value – the only direct evidence of which was the half-asleep impression of a person who admitted that she may have been hallucinating, and the evidence that the investigator considered was not properly weighed – with the investigator, instead, discounting every statement from the accused and heavily weighing prejudicial evidence that should have been excluded. Thus, Tulane's decision was arbitrary and capricious.

198.    Defendant's breach of its obligations proximately caused Doe damages, including loss of educational and career opportunities, and other direct and consequential damages that were foreseeable consequence of Defendant's actions.

199.    John Doe is entitled to recover damages for Defendant's breach of its obligations in an amount to be determined at trial.

## COUNT IV
### Breach of the Covenant of Good Faith and Fair Dealing

200.    The allegations of Paragraphs 1 through 199 are incorporated herein by reference, as if set forth in their entirety.

201.    Every contract contains within it an implied covenant of good faith and fair dealing. Tulane is liable to Doe for breaching the covenants of good faith and fair dealing which Tulane owed to Doe.

202.    Tulane breached such covenants by pursuing and conducting the investigation and adjudication of allegations against Doe in an unfair and biased manner, and then unfairly punish Doe in a disproportionately harsh and biased manner.

203.    As a direct and proximate result of Tulane's breach of the covenants of good faith and fair dealing, Plaintiff has suffered the damages in an amount to be determined at trial.

## COUNT V
## Detrimental Reliance

204.    The allegations of Paragraphs 1 through 203 are incorporated herein by reference, as if set forth in their entirety.

205.    In the alternative, Plaintiff alleges that Defendant is liable to him for detrimental reliance.

206.    Doe justifiably relied to his detriment on Defendant's promise that it would act in good faith towards him, a sophomore student enrolled at the University. In that regard, Tulane's Code and other written policies constitute representations and promises that Tulane should have reasonably expected to induce action or forbearance by Doe.

207.    Tulane expected or should have expected that Doe would accept its offer of admission, incur tuition and fees, and choose not to attend other colleges based on the University's express and implied promises that Tulane would not tolerate, and Doe would not suffer, harassment by fellow students, that gender discrimination would not act as a motivating factor in any decision to discipline Doe, and that Tulane would not deny Doe the procedural protections to which he is entitled, should he be accused of violating Tulane's policies.

208.    Doe relied to his detriment on these express and implied promises and representations by Tulane. Doe further justifiably relied to his detriment that Tulane would act in good faith to ensure that such promises were effectuated, but Tulane's actions and inactions in failing to fairly and impartially investigate and adjudicate the allegations made against Doe have materially undermined such promises.

209.    Defendant knew, or should have known, that Doe would justifiably rely on the such promises and representations, which were material inducements to Doe choosing to attend Tulane.

52

210.    Defendant's actions in unfairly finding him responsible for an offense he did not commit, and disproportionately sanctioning him in a manner that will result in severe stigma, has caused and will continue to cause damage and loss to Doe.

211.    Plaintiff is entitled to recover such damages in an amount to be determined at trial.

## **JURY DEMAND**

212.    Plaintiff demands a trial by jury of all issues presented herein that are capable of being tried by a jury.

**WHEREFORE**, Plaintiff John Doe respectfully requests that, after due proceedings are had, the Court:

1.    Without bond, issue a preliminary and permanent injunction preventing Defendant, its employees, agents, successors, and assigns from imposing any suspension on Plaintiff related to the subject matter of this suit;

2.    Order Defendant to reverse its findings that Plaintiff violated the student conduct policies at issue in this suit, and to expunge his record related to same;

3.    Enter judgment in favor of Plaintiff and against Defendant in an amount to be determined at trial, together with pre-judgment interest, costs, and attorney's fees; and

4.      Grant Plaintiff any such other, further, or different relief as the Court may

deem just and proper.

Dated: June 28, 2019

Respectfully Submitted,

/s/ Ellie T. Schilling
William P. Gibbens, 27225
Ellie T. Schilling, 33358
Schonekas, Evans, McGoey
& McEachin, LLC
909 Poydras Street, Suite 1600
New Orleans, Louisiana 70112
Telephone: (504) 680-6050
Facsimile: (504) 680-6051
billy@semmlaw.com
ellie@semmlaw.com

-and-

Brian Capitelli, 27398
Justine Geiger Daniel, 36856
Capitelli & Wicker
1100 Poydras Street, Suite 2950
New Orleans, Louisiana 70163
Telephone: (504) 582-2425
Facsimile: (504) 582-2422
brian@capitelliandwicker.com
justine@capitelliandwicker.com

Attorneys for John Doe