## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| JOHN DOE, | *  CIVIL ACTION NO.: 19-11403 |
| Plaintiff | *  |
| | *  SECTION: |
| v. | *  |
| | *  JUDGE: SARAH S. VANCE |
| THE ADMINISTRATORS OF THE TULANE EDUCATIONAL FUND, | *  MAGISTRATE:   JANIS VAN MEERVELD |
| Defendants | *  |
| *    *    *    *    *    *    *    * | |

## MEMORANDUM IN SUPPPORT OF MOTION FOR PRELIMINARY INJUNCTION

Plaintiff, John Doe, files this Memorandum in Support of his Motion for Preliminary Injunction, and respectfully requests a preliminary injunction prohibiting Defendant, The Administrators of the Tulane Educational Fund ("Tulane" or the "University"), and Defendant's employees, agents, successors, and assigns from removing Doe from school and suspending him for sexual assault charges that he did not commit, pending a final determination on the merits of this action. Based on a botched investigation and biased adjudication of allegations of nonconsensual sexual contact, Tulane has suspended John Doe for three semesters. Without intervention by this Court, Doe will not be able to continue his studies at Tulane in the Fall.

## INTRODUCTION

This suit challenges Tulane's actions, including the finding of responsibility and sanction imposed, on the basis that Tulane failed to follow its own written policies and thereby breached its contract with Doe; in addition, Tulane's sexual misconduct policies, in general, and the manner in which they were implemented in this case, specifically, fail to ensure fundamental fairness in

1

violations of Title IX of the Education Amendments of 1972 ("Title IX"). As such, Doe has a substantial likelihood of success on the merits of his claims.

However, without appropriate redress, the incorrect and unfair outcome of Tulane's disciplinary proceeding will irreparably harm Doe by interrupting his education or forcing him to attend an inferior school and preventing him from completing his education at Tulane, either of which will result in an attendant loss of future education and employment opportunities. Notably, Tulane will not allow Doe to transfer in credits obtained elsewhere during his suspension; thus, he cannot simply avoid this harm by attending school at another institution during the period of his suspension. His education will, therefore, either be interrupted for a year and a half, or he will be forced to transfer to another school, which given the time constraint and the highly damaging findings and sanctions currently in his education file, will necessarily be an inferior school to Tulane. This Court should, therefore, find that the only way to prevent irreparable harm to Plaintiff is to enjoin Tulane from imposing the suspension, pending a final resolution on the merits.

## STATEMENT OF FACTS[1]

John Doe is a twenty-year old student who attended a Catholic high school in Texas before matriculating to Tulane. It was Doe's life-long dream to attend Tulane because his great-grandfather attended Tulane, and Doe grew up hearing stories about how much it meant to his grandfather to grow up on and around the Tulane campus. Doe was, therefore, thrilled to enroll at Tulane for the Fall 2017-2018 school year. He has excelled in his studies, both in high school and at Tulane, and prior to the allegations in this case, he has never been accused of any misconduct.

Early in his freshman year, Doe and fellow Tulane student Jane Roe became friends, which quickly turned to a consensual sexual relationship. The physical relationship lasted a few months

---

[1] A full recitation of the factual background is detailed in Plaintiff's Complaint for Damages and Injunctive Relief, filed contemporaneously herewith and incorporated herein by reference.

during the Fall of 2017. Eventually, John wanted a serious relationship with Jane, but she did not, and the two began seeing each other less as the Spring semester approached. During the Spring of 2018, John and Jane remained friends, and saw each other around campus, but no longer spent much time together. During the Spring of 2018, Jane's good friend, Witness 1, also became friends with John and John and Witness 1 eventually engaged in consensual sexual activity. It is unclear when Jane learned that her friend had had a sexual relationship with John.

Upon returning to campus for the 2018-2019 school year, Jane reached out to John and the two began communicating again, which culminated in Jane going to John's residence at midnight on September 29, 2018 – Jane's birthday – to watch a movie. Unbeknownst to John, Jane had spent much of the day drinking and had taken Klonopin, a prescription sleep medication that amplifies the effects of alcohol, before arriving at his residence. The two cuddled in bed and watched the movie before both falling asleep; in the morning, the two continued to talk while lying in bed together and then John performed consensual oral sex on Jane. However, upon leaving John's residence – once Jane's friends who do not like John realized where she had spent the night – Jane told her friends that John had engaged in nonconsensual sexual touching the night before while she was asleep. She later reported the same to the University.

But Tulane's student conduct process is deeply flawed, and in matters dealing with allegations of sexual misconduct, time and again, Tulane has shown itself to be biased against male students. Tulane's current disciplinary process involves only one person: the same person investigates the allegations and makes all determinations as to credibility and which evidence to present in the investigative report, then decides the accused's guilt or innocence, and then decides the sanction to be imposed. It is a system that is designed to be quick and efficient for Tulane, not fair and accurate for the student who is accused.

Therefore, when Jane Roe reported the nonconsensual touching to the University, Tulane embarked on an investigation that was riddled with problems, and that was designed to find John guilty. The Investigator did not even consider credibility issues related to Jane's account – or evidence that the allegations may have been motivated by a desire to damage John's reputation – and instead, the Investigator improperly considered unsubstantiated, unrelated character evidence that cast John in a negative light and irrelevant evidence of John's alleged prior sexual history with other people. Then, not surprisingly, this same biased Investigator found him responsible for a sexual assault he did not commit and suspended him for four semesters, a sanction justified primarily on the basis of the same unrelated and unsubstantiated accusations of third parties. Tulane exercised no meaningful oversight over the Investigator's decisions, and on appeal, summarily upheld the finding of responsibility with no accompanying explanation or rationale.

On appeal, Tulane did, however, reduce the length of the suspension from four semesters to three semesters – but Tulane decided to make the decision on appeal, which was sent to John just two weeks before final exams and the end of the semester, effective immediately. Notwithstanding the late date, John was told that the suspension was, indeed, effective immediately, and continuing through December of 2020, and that he must cease his studies at Tulane and withdraw from his classes without receiving any credits. After being informed that John would seek a temporary restraining order, Tulane eventually relented and allowed John to remain in school and finish the semester; therefore, he will not be saddled with an additional lost semester. However, the outcome of Tulane's erroneous decision at a time when applications to transfer were long since has due left John with few options for continuing his education elsewhere and deprived him of a meaningful opportunity to transfer. Tulane will impose its suspension for the next year and a half, beginning with the Fall of 2019 and continuing until December of 2020.

The apparent reason for the lengthy suspension is to remove John from Tulane so that Jane can seamlessly continue her education without feeling "terrified" of running into John, as she claimed in her Impact Statement submitted to the Investigator. However, around the same time she submitted her Impact Statement, and before there was any decision from the Investigator, Jane chose to remain enrolled in, and attend, a small class in which John was already enrolled, despite the fact that Jane was given several alternatives that would have allowed her to avoid seeing John.

In that regard, before the Spring semester began, John signed up for an elective class comprised of 25–30 students; then, around the second week of the semester, Jane voluntarily enrolled in the class. Upon realizing John was in the class, Jane continued attending anyway – even after the professor informed all the students that if the timing of that particular section was inconvenient, students could instead attend one of the professor's other two sections taught on the same day, Jane chose to continue attending the same section as John. The class proceeded with the two students enrolled in and attending the same section, without incident, the entire semester.

Indeed, the two students shared the Tulane campus from September when the incident allegedly occurred through the end of the school year without Jane or anyone else reporting feeling threatened by John. And even after the sanction became final, Tulane decided not to impose the suspension immediately, and allowed John to remain in University housing and to continue attending classes and exams on campus, without restriction, the same as any other student.[2] Clearly, neither Tulane nor Jane believes John to be a threat, and his removal from school and forthcoming disruption to his education cannot be justified on that basis. Therefore, this Court should maintain the status quo and allow John to continue attending Tulane in the Fall.

---

[2] The only exception is a <u>mutual</u> no contact order that Tulane issued to both John and Jane in early October. There are no allegations that John ever violated the no contact order, and he intends to abide by it for the remainder of his time at Tulane. If this was the only protection that Tulane and Jane believed was necessary for nearly the entire 2018-2019 school year, there is no reason it would not be sufficient for the 2019-2020 school year.

## LAW AND ARGUMENT

### A.     Standard Of Review.

John Doe is entitled to a preliminary injunction. To obtain such relief, the moving party must show: (1) a substantial likelihood of success on the merits; (2) a substantial threat that failure to grant the injunction will result in irreparable injury to the moving party; (3) the threatened injury outweighs any damages the injunction may cause defendant; and (4) the injunction will not disserve the public interest.[3] Based on the arguments and evidence presented herein, including the University's Code of Student Conduct (the "Code") and the Procedural Protections for Responding Students (the "Procedural Protections") attached to the Complaint, and at the hearing on the Motion for Preliminary Injunction, this Court should find that Doe has met this standard.[4]

### B.     John Doe Has A Substantial Likelihood Of Succeeding On The Merits.

As explained herein, the investigation and adjudication failed to ensure fundamental fairness, and were infected by gender bias. In addition, despite the paltry procedural protections provided by Tulane's disciplinary process, Tulane substantially deviated from its own policies and procedures and thereby breached its obligations to Doe. Thus, John has a substantial likelihood of succeeding on the merits of his breach of contract claim and his Title IX erroneous outcome claim.[5]

#### 1.     Tulane Failed to Adhere to its Written Policies and Breached its Contract with Plaintiff.

By enrolling at Tulane and paying tuition, Doe entered into a relationship with the University that is contractual in nature whereby Tulane was obligated to comply with the terms of

---

[3]     *See, e.g., Opulent Life Church v. City of Holly Springs, Miss.,* 697 F.3d 279, 288 (5th Cir. 2012).

[4]     *See Univ. of Tex. v. Camenisch,* 101 S. Ct. 1830, 1834 (1981) (holding that a "preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits. A party thus is not required to prove his case in full at a preliminary injunction hearing.").

[5]     Plaintiff submits that he has a likelihood of succeeding on all claims; however, some will require more factual development than can be accomplished before August when John must know if he can continue his studies at Tulane. Therefore, the request for preliminary injunction focuses on the breach of contract and erroneous outcome claims.

its written policies and procedures.[6] Tulane is, therefore, bound to conduct its investigations and adjudications in a manner that is consistent with its sexual misconduct policies. Moreover, if there is any ambiguity in the contract between Plaintiff and Tulane, the ambiguity must be read against the University because the University is the only party with the authority to draft the documents.[7] Here, Tulane did not follow its written policies, and breached its contract with Doe.

### a.    Tulane's written obligations, representations, and policies.

Tulane's Code guarantees that the University will treat its students fairly in disciplinary proceedings. Among other things, Tulane's Code assures students that the University "uses an investigative procedure administered by trained professionals, subject to substantial review and specified rights to appeal," and promises that the process is "a neutral and fair investigation with no presumption of wrongdoing."[8] The Code states that the investigator's determination of responsibility will be by a preponderance of the evidence, and promises that the process "is designed to provide a fair and reliable gathering of facts by a trained and impartial investigator."[9]

In order to accomplish this allegedly neutral and fair investigation, and correctly apply a preponderance of the evidence standard, the Code specifies that the investigator can exclude

---

[6]    *See Babcock v. New Orleans Baptist Theological Seminary*, 554 So.2d 90, 96-97 (La. App. 4 Cir. 1989 ("school publications given to students were part of the terms of a 'contract' between a school and its students."); *I.F. v. Administrators of Tulane Educational Fund*, 131 So.3d 491, 498 (La. App. 4 Cir. 2013) ("we find that I.F. and Tulane were in a contractual relationship during I.F.'s attendance at Tulane"); *Shafiq v. Ochsner Health Sys.*, No. CV 18-8666, 2019 WL 1199755, at *4 (E.D. La. Mar. 14, 2019) ("It is generally held across the jurisdictions of the United States that the basic legal relation between a student and a private university or college is contractual in nature. The terms of the contract are rarely delineated; however, it is generally accepted that the catalogs, bulletins, circulars, and regulations of the university made available to the student become part of the contract."); *see also Merrow v. Goldberg*, 672 F. Supp. 766, 774 (D. Vt. 1987) (college was bound to adhere to the statements made in its "brochures, course offering bulletins, and other official statements, policies and publications of the institution.").

[7]    *See, e.g., Reynolds v. Sterling College*, 170 Vt. 620, 622 (2000), *quoting Gamble v. University System of New Hampshire*, 136 N.H. 9, 14-15 (1992) ("This court will, where possible, avoid constructing the contract in a manner that leads to harsh and unreasonable results or places one party at the mercy of the other. To interpret the contract as the defendants urge us would leave the student at the mercy of the University.").

[8]    *See* Code, Ex. "A," attached to Complaint, at Sec. VI., Sec. VI.A.

[9]    *Id.*, at Sec. IV.E.

information that is "irrelevant, immaterial, or more prejudicial than informative."[10] The Code further states that the investigator should exclude character evidence because "<u>information regarding character is not relevant</u> to the determination of whether there has been a violation of this Code."[11] And the Code explicitly dictates, in most cases, "and certainly involving matters of sexual harassment or sexual assault, a party's <u>character or reputation with respect to other sexual activity is not relevant and will not be considered as evidence.</u>"[12] The Code also promises that a party's prior or subsequent sexual activity is rarely relevant, and a party's sexual history with third parties is only relevant "under very limited circumstances to prove intent, motive, absence of mistake, or to explain an injury."[13] Thus, one of the Code's key promises is that unrelated evidence will not be considered, and in particular, that highly-prejudicial unrelated evidence, such as a party's reputation for sexual behavior or sexual history with others, will not be considered.

Here, the process that Tulane employed, often in violation of its own Code, undermined the fairness of the investigation, contributing significantly to the erroneous outcome.[14]

      **b.**    **Tulane violated its policies, resulting in an unfair and biased <u>investigation and adjudication that breached Tulane's obligations.</u>**

Tulane breached its contract with Doe by failing to comply with its obligations and follow its written policies during the investigation and adjudication. Rather than "a neutral and fair investigation with no presumption of wrongdoing," Tulane's investigation of the allegations

---

[10]    *Id*.

[11]    *Id*. (emphasis added).

[12]    *Id*. (emphasis added).

[13]    *Id*. The limited circumstances delineated where prior sexual activity is relevant, at all, are pattern evidence, prior sexual history between the parties, and prior sexual history with other parties. *Id*. Further limiting the relevance of sexual activity with third parties, such evidence is circumscribed by the Code's mandate that pattern evidence must be assessed for whether the previous conduct was "substantially similar" to the conduct at issue.

[14]    *See, e.g., Doe v. Rollins Coll.*, 352 F.Supp.3d 1205, 1207 (M.D. Fla. 2019) (investigator's report "did not tell the whole story. Instead, it included a number of irrelevant, inflammatory, and conclusory statements about Plaintiff—crediting the testimony of Roe's witnesses over Plaintiff's while making untoward editorial comments about Plaintiff's prior sexual history…even though the report acknowledged conflicting testimony and no additional eyewitnesses, [the investigator] provided a credibility assessment of both actors—Jane Roe was credible but Plaintiff was not.").

against Doe was unfair and biased.[15] In particular, Defendant breached its obligations under the Code, and other University documents, by failing to provide adequate notice of the actual conduct under investigation; failing to provide a fair and reliable gathering of the facts by an impartial investigator; failing to correctly and impartially apply the preponderance of the evidence standard; and failing to subject the investigative findings and sanction to substantial review by other Tulane official.[16] Most egregiously, the University's failed to exclude irrelevant and prejudicial evidence, defined by the Code as evidence that will not be considered.

### i.    Lack of fair notice of the conduct under investigation.

Tulane violated the Code and the Procedural Protections by failing to provide Doe with adequate notice of the conduct under investigation and the charges that Doe was facing. The Investigator issued her final investigation report on February 11, 2019, setting forth her interpretation of the facts and her ultimate findings. The final investigation report was provided to Doe and his faculty advisor for their review, as required by the Code. Then, on March 8, 2019, in response to Doe's request for a copy of his conduct record, Tulane provided a redacted copy of the Investigator's report ("Redacted Report"). The Redacted Report contained several substantial changes, including for the first time that on October 11, 2018, the Investigator had informed Doe of an "additional conduct charge of sexual harassment." But neither the Investigator, nor anyone else, ever indicated that "sexual harassment" had been charged or even mentioned.

Even more concerning, throughout the entire process, Tulane represented to Doe that he was being investigated for one charge: "Sexual Assault–Sexual Contact," as stated in the Notice

---

[15]    *See* Code, at Sec. IV.A.

[16]    As detailed in the Complaint, other breaches of Defendant's contractual obligations include: failure to investigate Roe's conduct in disseminating confidential communications and whether it had violated Doe's rights; and failure to provide Doe with an opportunity to review and comment on a redacted investigation report, which the Investigator issued after the investigation was completed but which became the final investigation report.

of Investigation.[17] Tulane further assured Doe that if any additional or different conduct violations were identified, Doe would be informed "during conduct meetings, official reports, and/or other methods as deemed appropriate."[18] Yet, Tulane never informed Doe of any additional charges. Nevertheless, according to the Redacted Report, Doe was found responsible for <u>two</u> separate violations: (1) Sexual Assault–Sexual Contact, and (2) Sexual Assault–Sexual Intercourse. Before the report was redacted, however, Doe was found responsible for only <u>one</u> violation, and Doe was never informed of a Sexual Assault–Sexual Intercourse charge, conduct that an ordinary person would deem significantly more egregious, and that is now part of his permanent record.

In addition, Doe had no way of knowing the degree to which unrelated sexual misconduct allegations would infect the investigation because he was never put on notice that this conduct was actually under investigation, as well, in order for him to properly defend himself. Yet, for more than four months, the Investigator questioned Doe, the complainant, and third parties not only about the complainant's allegations, but about Doe's previous sexual partners and behavior, and about his character and reputation, in general, ultimately finding that he deserved to be suspended for four semesters based upon an alleged "pattern of behavior." Clearly, uncharged conduct in this case swayed the determination of responsibility and prejudiced the sanctions process.[19]

### ii. Failure to exclude irrelevant and prejudicial evidence or to provide a fair and reliable gathering of the facts.

Throughout the investigation, Tulane violated the core of its policies by failing to provide a fair and reliable gathering of the facts by a trained and impartial investigator by, among other

---

[17]     *See* Exhibit "A," attached hereto.

[18]     *Id*.

[19]     Moreover, this uncharged conduct influenced the decisions even though the Investigator acknowledged that "the additional allegations against [Doe] have not been thoroughly investigated and he has not been found responsible" for such alleged misconduct. The Association of Title IX Administrators warns: "[T]o sanction a student based on only an allegation, without an investigation or finding of responsibility, is a glaring due process violation" *See* ASS'N OF TITLE IX ADM'RS, *The ATIXA Guide to Sanctioning Student Sexual Misconduct Violations* (Feb. 2018), *available at* <u>https://atixa.org/wordpress/wp-content/uploads/2018/02/ATIXA-2018-Whitepaper-FINAL-Feb-2018.pdf</u>.

things, failing to exclude irrelevant and prejudicial evidence. The Code clearly states that the Investigator will exclude information that is "irrelevant, immaterial, or more prejudicial than informative," particularly in cases involving alleged sexual misconduct.[20] Further, "character evidence" is defined as information that does not directly relate to the facts at issue, but instead reflects upon the reputation, personality, qualities, or habits of an individual, and generally, such information is not relevant to determining whether there has been a Code violation.[21]

Rather than heeding these instructions, which mirror the evidentiary standards courts use to determine admissibility, the Investigator intentionally included unsubstantiated, irrelevant, and prejudicial character evidence in her investigation report. This "evidence" included statements from Jane's friends that John was "talking to a bunch of other girls" at the same time as his relationship with Jane during the 2017-2018 school year, and that John was "known for sending" unsolicited naked pictures of himself to lots of girls. The Investigator included statements from another of Jane's friends that John had not treated Jane well in the past and had "hooked up with a lot of other women during the same time [John] was hooking up with [Jane]," despite the Investigator knowing that the same friend had admitted that she does not know John personally and had never spoken to him. The Investigator also included the claim from Jane's friend that John's fraternity is "referred to as 'sexual assault expected'" and is "nationally 'known' for commonly assaulting girls." These statements amount to nothing more than rumors – and rumors that were obviously prejudicial to Doe and should have been excluded.

Simply put, the Investigator "did not tell the whole story. Instead, [she] included a number of irrelevant, inflammatory, and conclusory statements about Plaintiff—crediting the testimony of Roe's witnesses over Plaintiff's while making untoward editorial comments about Plaintiff's prior

---

[20]     *See* Code, at Sec. IV.E.
[21]     *Id*.

sexual history…[and] even though [the Investigator] acknowledged conflicting testimony and no additional eyewitnesses, [she] provided a credibility assessment of both actors—Jane Roe was credible but Plaintiff was not."[22]

In addition, the Investigator repeatedly sought irrelevant and unsubstantiated information regarding Doe's character and reputation, which the Code clearly prohibits.[23] Similarly, a party's prior sexual history is typically not relevant; nonetheless, the Investigator heavily relied upon the unrelated allegations made against John by Jane's friends, who comprised the vast majority of the individuals who she interviewed – and none of the allegations relate to the three "limited circumstances" set forth in the Code. [24] Notwithstanding, the Investigator focused on and repeatedly questioned witnesses about John's alleged sexual history with third parties, who are Jane's closest friends who all of the sudden came forward with their own claims of nonconsensual sexual interactions with John. Moreover, the Investigator did not even attempt to make a finding that intent, motive, or absence of mistake were at issue, as required by the Code to establish relevance with respect to evidence regarding third parties – the factors are not even mentioned in the report.[25] These allegations were unrelated, and highly-prejudicial, to Doe; without establishing a high degree of relevance, the information clearly should have been excluded.

Further, the Investigator expressly acknowledged in her report that the unrelated allegations "have not been thoroughly investigated" and that Doe has "not been found responsible for any misconduct related to those allegations." Yet, the Investigator's findings and ultimate sanction relied heavily on these same accusations, basing her findings on the prejudicial allegations, and

---

[22]     Doe v. Rollins Coll., 352 F.Supp.3d 1205, 1207 (M.D. Fla. 2019).
[23]     *Id*.
[24]     *Id*.
[25]     Meanwhile, the Investigator intentionally ignored the history of consensual sexual activity between Doe and Roe – which specifically may be considered under the Code to "assess the manner and nature of communications between the parties." *Id*. Particularly in a case like this where the parties disagree entirely about the events that occurred, the manner in which they interacted and communicated in the past is relevant and should be considered.

improperly relying on them to justify her conclusion that John had exhibited a "pattern of behavior" and should be suspended from Tulane immediately, and continuing for the next two years.[26]

### iii.    Failure to consider all relevant evidence demonstrates the <u>preponderance of evidence standard was not correctly applied.</u>

The Investigator's decision to include irrelevant and highly-prejudicial information is not the only evidence of Tulane's failure to provide a fair and impartial gathering of the facts, or failure to correctly and impartially apply the preponderance of the evidence standard. Compounding the problem, the Investigator did not consider relevant evidence in reaching her conclusion that John was responsible for sexual assault – including the ample evidence that Jane had been drinking much of the day and had taken Klonopin, a powerful sedative medication that amplifies the effects of alcohol, shortly before arriving at Doe's residence. Such evidence included text messages where Jane stated that she had taken the medication and said that she possibly hallucinated certain events during the night. Jane also consistently reported that she kept falling back asleep during the claimed nonconsensual touching, further calling into question how lucid she was.

But incredibly, Jane's possible incapacitation – and the fact that John had no way of knowing that she may have been incapacitated – was not addressed anywhere in the Investigator's findings or the material facts recited, and she did not even consider whether Jane may have dreamt or otherwise hallucinated the unwanted touching, which was supported by Jane's own text stating, "I passed out and I'm pretty sure at one point I like hallucinated that there were people in the room when there weren't." Notably, Jane and John did not disagree as to whether she consented to unwanted touching in the middle of the night; they disagreed about whether that conduct occurred

---

[26]     In addition, while Doe's prior sexual history with third parties should have been excluded because it did not meet the standard for relevance established by the Code, these allegations also did not meet the standard of "pattern evidence" in order for the Investigator to properly consider them. The Investigator focused on unsubstantiated accusations of completely unrelated conduct that were not in any way similar to the conduct under investigation.

at all. Therefore, Jane's mental state and ability to accurately perceive what was going on around her was obviously relevant to the investigation. Failure to consider and evaluate such evidence was a clear departure from the Investigator's duty to provide a fair and reliable gathering of the facts.[27]

Further, it appears the Investigator presumed that John was responsible for the alleged wrongdoing from the beginning and skewed the facts and inferences in the light most favorable to Jane. For example, the Investigator found that John made inconsistent statements, which was held against him, while at the same time Jane's inconsistent statements were discounted and not held against her. The Investigator relied heavily on what she considered to be an inconsistency in John's statements, and information the Investigator claimed that he had omitted, in determining that Jane's account was more credible. But John did not change his story or omit information: John stated from the beginning that he had performed consensual oral sex on Jane the following morning – the purportedly omitted information (that digital penetration occurred at the same time) was a detail of the same sexual act, which was the reason he did not separately mention it until asked by the Investigator, and which he made clear to her.

Meanwhile, Jane's inconsistencies were consistently, and consciously, ignored. For instance, Jane immediately lied to her friends in a group text, reporting to them that she had gone to John's residence the night before to smoke marijuana, rather than at midnight to watch a movie – which she eventually admitted to the Investigator was because her friends do not like John and do not approve of her spending time with him. She further did not tell her friends that the two had

---

[27]     Significantly, Doe was found "not responsible" for the only sexual contact that both Jane and John agreed had actually occurred – oral sex performed by John on Jane the following morning, which was not found to be nonconsensual.

engaged in oral sex at all and did not describe that conduct in her initial incident report to Tulane, but she then claimed during the investigation that the oral sex was nonconsensual.[28]

Notwithstanding these discrepancies, the Investigator determined that Jane's account remained consistent throughout the process. Again and again, the Investigator viewed and interpreted the facts in the light most favorable to Jane, and the burden of proof was improperly shifted to John to prove his innocence.[29] Tellingly, the Investigator refused to consider the fact that at the outset of the investigation, Jane disseminated confidential university communications describing the charges against John. Indeed, almost immediately after Tulane issued the notice of investigation, Jane distributed it to third parties – including to friends who do not even attend Tulane. John and his faculty advisor reported Jane's inappropriate behavior, and Tulane issued a cease-and-desist order to Jane. But in light of the evidence showing that Jane and her friends were angry with John, Jane's distribution of the confidential charge letter, which obviously painted John in a negative light, should have called her credibility into question, indicating a possible motive to retaliate against him and damage his reputation – however, the Investigator did not even reference Jane's inappropriate disclosure in her findings, let alone assess its impact on her credibility.

---

[28]   There were also other inconsistent statements made by Jane that reflect on her credibility but were either discounted by the investigator or do not seem to have been considered at all. For example, Jane did not mention Witness 1's allegations that John had engaged in nonconsensual sexual activity with her in Jane's initial investigative interview, but Jane later said that Witness 1 had told her the allegation a few days after Jane told her friends about the incident with John. If that were true, Jane would have known about Witness 1's story at the time of the initial interview, and failing to bring it up would be a significant oversight. Therefore, Jane's disclosures on this issue were clearly inconsistent, and the late timing of Witness 1's allegations also raises credibility issues regarding both Jane and Witness 1 – who is the good friend that had a sexual relationship with John shortly after Jane's relationship with John, and it is unclear when and how Jane found out about it. Nonetheless, the Investigator deemed Jane to be "more credible" and "consistent" than John, and did not delve into these or any other issues that may have implicated Jane's credibility or motivation to retaliate against John.

[29]   The Investigator's bias and preference for Jane's side of the story appears throughout – for example, the material facts of the report claim that it is "undisputed" that Jane became "uncomfortable" with John's behavior between the Spring and Summer of 2018, even though the witness statements do not support that conclusion. The facts contained in the witness statements support a conclusion that Jane was angry with John during this period, or that, at most, the two had some sort of falling out. But John did not report that Jane had become uncomfortable with his behavior because he never knew that she was purportedly uncomfortable, only that she was upset with him about something. Describing it as undisputed that Jane had become "uncomfortable" with John's behavior indicates the Investigator's clear preference for Jane's side of the story.

### iv. Failure to subject the Investigator's findings and sanction to substantial review.

Finally, Tulane violated its obligation to subject the investigative findings and sanction to substantial review by other Tulane officials – which is particularly prejudicial to Doe, now that Tulane has adopted the widely-criticized single investigator model.[30] Notwithstanding that the single investigator is the only person empowered to determine guilt, and the only person empowered to decide the sanction imposed, the Code promises that the determinations are "subject to substantial review and specified rights to appeal."[31] However, the final investigation report, which contained the Investigator's conclusions regarding the findings and the sanction, was sent to the Director of Student Conduct and the Title IX Coordinator to "review" the same day the report was ultimately completed and released. Those are the only Tulane officials identified as having "reviewed" the findings and sanction. Moreover, the final report is 83 pages, much of which is single-spaced, such that there is simply no possibility that these individuals exercised any meaningful review of the evidence or the decisions reached in less than one day, in order to ensure that Tulane complied with its obligations under the Code.[32]

Accordingly, Tulane violated its written policies and breached its contract with Doe in multiple ways, and Doe is substantially likely to succeed on the merits of his claim.

---

[30]    *See, e.g., Doe v. Brandeis Univ.,* 177 F.Supp.3d 561, 606 (D. Mass. 2016) ("The dangers of combining in a single individual the power to investigate, prosecute, and convict, with little effective power of review, are obvious. No matter how well-intended, such a person may have preconceptions and biases, may make mistakes, and may reach premature conclusions.").

[31]    *See* Code, at Sec. VI.

[32]    The fact that on appeal, Tulane reduced the suspension by one semester does not change this conclusion. The Code assures students that the single investigator's determinations are "subject to substantial review" in the first instance – meaning, before they are finalized – as a way of justifying the use of such an inherently biased and flawed model. But other Tulane officials exercise almost no oversight or review of the Investigator's decisions, and a student's appeal rights under the Code are so limited, and the grounds for appeal so narrow, that meaningful review is impossible, and erroneous outcomes cannot be remedied.

2.      **Tulane Violated Title IX by Using Plaintiff's Gender as a Motivating Factor in its Decision to Discipline Plaintiff.**

Among other things, Title IX bars the imposition of university discipline where gender is a motivating factor in the decision to discipline. In order to allege that a college reached an erroneous outcome in a disciplinary proceeding in violation of Title IX, the plaintiff must "allege particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the proceeding," and "must also allege particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding."[33] The pleading burden with regard to the facts supporting the inaccuracy of the outcome "is not heavy."[34] Here, Tulane reached an erroneous outcome in finding John responsible for sexual assault.

First, Tulane's existing policies and procedures are not adequate to ensure that students accused of serious, quasi-criminal conduct are treated with fundamental fairness – Tulane's reliance on a single investigator to investigate and adjudicate such cases dramatically increases the likelihood of an erroneous outcome. Tulane's existing policies and procedures are further fundamentally unfair in the following non-exclusive ways: the absence of any right to a hearing, the inability to adequately confront or cross-exam your accuser or other material witnesses, the lack of meaningful appeal rights, and the lack of sufficient oversight and review by University officials of the investigator's decisions regarding both the outcome and the sanction

Second, the process that Tulane actually employed in this case, often in violation of its own Code, further undermined the fairness of the investigation and adjudication, contributing significantly to the erroneous outcome. The multiple procedural errors in the investigation and

---

[33]     *See, e.g., Yusuf v. Vassar College,* 35 F.3d 709, 715 (2d Cir. 1993); *see also Plummer v. Univ. of Houston*, 860 F.3d 767 (5th Cir. 2017) (accepting Title IX standard articulated in *Yusuf*).
[34]     *Yusuf*, 35 F.3d, at 715.

analysis of the evidence, as detailed herein and in the Complaint, cumulatively, and in some instances individually, amounted to a material deviation from acceptable procedures that substantially influenced the Investigator's determination of responsibility and the ultimate sanction imposed. If these procedural errors had not occurred – such as the Investigator's reliance upon unsubstantiated and irrelevant allegations related to Doe's prior sexual history – he would not have been found responsible for sexual assault. At the very least, Tulane's inherently flawed process, coupled with the procedural errors here, casts significant doubt on the accuracy of the outcome.

In addition, as detailed more fully in the Complaint, the totality of the circumstances demonstrates that gender bias was a motivating factor in Defendant reaching its erroneous outcome.[35] Tulane officials have made statements and given presentations that evidence a gender bias against males – the Title IX Coordinator and other University officials perpetuate the idea that males are aggressive perpetrators of sexual violence by consistently emphasizing to students and administrators that society is plagued by a rape culture, in which female victims are blamed or disbelieved, and male sexual violence is normalized.[36] Tulane has also faced external pressure that led to gender bias – beginning in or around 2014, Tulane faced pressure from the federal government to crack down on sexual assault, and sustained criticism from student activists that the University was not doing enough to combat sexual violence on campus.[37] As a result, Tulane significantly reduced the due process protections for accused students, and hired Meredith Smith

---

[35] *See id.* (in order to show a causal connection between the flawed outcome and gender bias, "allegations might include, inter alia, statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender.").

[36] *See, e.g., Doe v. Washington and Lee Univ.,* 2015 WL 4647996, *10 (W.D. Va. Aug. 5, 2015) (plaintiff "plausibly established a causal link between his expulsion and gender bias" where a university official endorsed gender-biased magazine article and was an official who wielded significant influence on the case).

[37] *See, e.g., Doe v. Miami Univ.,* 882 F.3d 579, 594 (6th Cir. 2018) ("Considering all of these factual allegations relating to Miami University's pattern of activity respecting sexual-assault matters and the asserted pressures placed on the University [by the federal government and students], John has pleaded sufficient facts to support a reasonable inference of gender discrimination.").

as the Title IX Coordinator. Since Ms. Smith began her tenure, the number of disciplinary proceedings initiated, the percentage of students found responsible, and the percentage of students who are suspended or expelled, have all increased dramatically – and male students have overwhelmingly borne the brunt of these increases.[38]

Tulane has further perpetuated this gender bias and discrimination against male students through actions such as its Sexual Misconduct Climate Survey, which reinforced the narrative that female students are victims of sexual assault at the hands of male perpetrators, and reinforced the notion that Tulane was not doing enough and the University needed to aggressively prosecute and severely sanction students accused of sexual misconduct. As a result, the University, once again, dramatically reduced the due process protections in the Code. In addition, Tulane students were predictably outraged by the results of the Sexual Misconduct Climate Survey – notwithstanding that the results are extremely flawed – and students increased their demands that Tulane respond aggressively to allegations of sexual misconduct. Ms. Smith, President Fitts, and other University officials reacted by promising that swift action will be taken when students come forward with allegations and that Tulane is committed to ending its rape culture.[39]

As a result, statistic evidence will reveal that Tulane is exhibiting gender bias. Upon information and belief, Tulane is initiating disciplinary proceedings against male students for sexual misconduct that the University previously would not have initiated; nearly all of the male students who are charged with sexual misconduct, and in particular sexual assault, are found

---

[38]     *See Plummer*, 860 F.3d, at 784 (J. Jones, dissenting) ("Sexual assault is not plagiarism, cheating, or vandalism of university property. Its ramifications are more long lasting and stigmatizing in today's society. The University wants to have it both ways, degrading the integrity of its factfinding procedures, while congratulating itself for vigorously attacking campus sexual misconduct. Overprosecution is nothing to boast about.").

[39]     *See Doe v. Columbia Univ.*, 831 F.3d 46, 57 (2nd Cir. 2016) (substantial criticism from student body and the media that university was not taking complaints of female students alleging sexual assault seriously enough, leading President and Dean to hold university-wide open meeting to discuss the issue, made it "entirely plausible that the University decision-makers and its investigator were motivated to favor the accusing female over the accused male.").

responsible; and of those, nearly all have been suspended or expelled regardless of the particular circumstances of their case.[40] Conversely, upon information and belief, Tulane routinely refuses to charge female students with sexual misconduct for violations such as nonconsensual sexual contact or stalking, and when female students are charged, nearly all are found not responsible, or are disciplined far less harshly than their male counterparts.

Accordingly, the evidence of the erroneous outcome in this case coupled with the evidence of gender bias establishes that Plaintiff is likely to succeed on the merits on his claim.

## C.  Plaintiff Will Suffer Irreparable Harm If A Preliminary Injunction Is Not Issued.

"Perhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered."[41] "To establish irreparable harm, a party seeking preliminary injunctive relief must show that 'there is a continuing harm which cannot be adequately redressed by final relief on the merits' and for which 'money damages cannot provide adequate compensation.'"[42]  Doe faces such harm: money damages cannot compensate him for the interruption to his education or the deprivation of his opportunity to attend Tulane, and the attendant loss of future education and employment opportunities that will result from the gap in his education or inability to attend a school of similar caliber.[43]

---

[40]    *See Miami Univ.*, 882 F.3d, at 593-594 (pattern of gender-based decision-making in disciplinary process supported inference of gender discrimination); *see also Doe v. Brown Univ.*, 166 F.Supp.3d 177, 189 (D. Rhode Island 2016) (finding that circumstantial evidence of gender bias at pleading stage was sufficient because '[r]equiring that a male student conclusively demonstrate, at the pleading stage, with statistical evidence and/or data analysis that female students accused of sexual assault were treated differently, is both practically impossible and inconsistent with the standard used in other discrimination contexts.").

[41]    *Monumental Task Comm., Inc. v. Foxx*, 157 F. Supp. 3d 573, 584 (E.D. La. 2016) (internal citations omitted).

[42]    *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002), *quoting N.Y Pathological & X-Ray Labs., Inc. v. INS*, 523 F.2d 79, 81 (2d Cir.1975).

[43]    *See Monumental Task Comm., Inc.,* 157 F. Supp. 3d at 583 (finding that the Fifth Circuit has defined irreparable harm to mean harm for which there is no adequate remedy at law, such as monetary damages).

No post-trial remedy can redress the harm the suspension would cause. As a result of Tulane's actions, Doe's education will be improperly interrupted, possibly for one and a half years. He will be forced to cease his studies at Tulane – the school that he has always wanted to attend – until January of 2021 when he had expected, instead, to graduate in May of 2021. There is no way to mitigate this interruption to his education at Tulane because he is not permitted to transfer in any credits taken at another university during his suspension.

Moreover, given the timing of Tulane's suspension so late in the school year, it will be difficult for Doe to avoid an interruption to his education by finding another institution to attend for the Fall semester, and given the extremely damaging notation in Doe's disciplinary record that he was found responsible for sexual assault, Doe will never be able to attend a school of similar quality to Tulane. Indeed, Doe has spent the past two months applying to other schools but has secured few admissions, and the acceptances he has received are from schools with significantly inferior reputations to Tulane. Therefore, he is currently being harmed by the suspension because it interferes with his ability to gain acceptance to a school of similar quality, and the erroneous sexual assault finding in his conduct record could ultimately prevent him from attending another school if he is forced to disclose it to schools during the admissions process.

Doe will, therefore, be irreparably harmed by a lengthy interruption to his education, or he will be forced to eventually attend another school of lesser quality and will be prevented from completing his education at Tulane. In addition, even if Doe is able to transfer to another school, albeit of inferior caliber, he will likely still suffer further disruption to his education because he will be unable to graduate on time. Securing a transfer as a Junior just before the start of the school year will make it very difficult for Doe to enroll in the classes that he needs to graduate on time,

and all of the credits that Doe has already earned may not transfer; thus, Doe would likely suffer additional delay and interruption to his future education and career opportunities.

As such, Doe should not be forced to wait until the resolution of a trial on the merits to know whether he can continue his studies at Tulane without a one and a half year delay.[44] Moreover, even if he were later to finish his degree at Tulane and succeed in this lawsuit in having the erroneous finding reversed, without an injunction, his academic record will be marred by a significant gap in his education occasioned by the delay in obtaining relief, which he will have to explain to any future graduate program or jobs to which he applies. Being forced to explain that he was suspended from Tulane after he was wrongfully accused of sexual assault will certainly have a negative impact on his ability to gain entrance to graduate school or to obtain a job, regardless of whether he ultimately succeeds in this lawsuit.[45]

Indeed, courts considering similar motions have found that irreparable harm will result from a suspension or expulsion from a university.[46] This Court should likewise find that the only way to prevent irreparable harm to Doe is to preserve the status quo and enjoin Tulane from imposing the suspension, pending a final resolution on the merits.

---

[44]    *See Jones v. Bd. Of Governors of Univ. of North Carolina*, 557 F.Supp. 263, 266 (W.D.N.C. 1983) ("finding that having "to explain for the rest of her professional life why she took a semester (or longer) off during her studies" constituted irreparable harm); *Doe v. New York Univ.,* 666 F.2d 761,773 (2d Cir. 1981) ("Ordinarily a one-year delay in obtaining admission to graduate school for the purpose of pursuing professional studies, as distinguished from interruption or termination of attendance already in progress, is insufficient to warrant an injunction in the absence of other circumstances militating in favor of such relief.") (emphasis added).

[45]    *See King v. DePauw Univ.*, 2014 WL 4197507, at *13 (S.D. Ind. Aug. 22, 2014) ("Successfully seeing this lawsuit to its conclusion could not erase the gap or the transfer; the question will be raised, and any explanation is unlikely to fully erase the stigma associated with such a finding."); *Marshall v. Ohio Univ.*, 2015 WL 1179955, at *9 (S.D. Ohio Mar. 13, 2015) ("Plaintiff will forever have this disciplinary action on his academic record, which may impact his ability to enroll at another institution, or affect his future career possibilities.").

[46]    *See Doe v. Middlebury College*, 2015 WL 5488109 (D. Ver. Sept. 16, 2015) (prohibiting college from expelling student and ordering college to allow student to enroll in the Fall semester); *Coulter v. E. Stroudsburg Univ.*, 2010 WL 1816632, at *3 (M.D. Pa. May 5, 2010) (finding student who was suspended from school during academic year had met burden of showing irreparable harm*); King v. DePauw Univ.*, 2014 WL 4197507 (same).

Lastly, Doe will suffer irreparable harm by virtue of the stigma and damage to his reputation associated with the suspension.[47] If Doe is forced to abruptly discontinue his studies at Tulane – under the cloud of a sexual assault disciplinary proceeding – the stigma associated with such an event will inevitably result in damage to his reputation among his fellow students, and any future institution he might attend, which cannot easily be quantified in money damages.[48]

**D.    The Balance Of Equities Are In Favor Of Granting An Injunction Because The Threatened Harm To Plaintiff Outweighs Any Harm to Defendant And An Injunction Is In The Public Interest.**

Neither Defendant nor the public interest will be harmed by the issuance of an injunction that merely preserves the status quo, in which Plaintiff is permitted to continue his studies at Tulane, as he has done for two years. This is precisely the purpose of preliminary injunctive relief – preserving the status quo.[49]

Moreover, there is no reason to believe that Defendant will suffer harm by maintaining the status quo because Tulane did so during the pendency of the disciplinary proceeding, allowing Doe to continue living on campus and attending classes, with the only restriction being a mutual no-contact order between Doe and Roe. Then Tulane reversed its immediate suspension and continued to allow Doe to live on campus and attend classes and exams, without any additional restriction, after the appeal was final. If Tulane believed that Doe was a threat to Roe or other members of the Tulane community, Tulane had remedies available to it on an interim basis if the

---

[47]    *See Helpful Hound, LLC v. New Orleans Building Corp.*, 2018 WL 3743817, *13 (E.D. La. 08/07/18) (finding that potential harm to reputation cannot be quantified, and "rises to the level of irreparable harm").

[48]    Notably, students beyond Tulane are already aware of the existence of John's sexual assault proceeding because Jane, in violation of Tulane's conduct policies, disseminated the confidential letter describing the disciplinary charges. Indeed, John was informed by a high school classmate attending college in Texas that he had received the letter. Tulane issued a cease and desist letter to Jane, but damage to John's reputation had obviously already occurred – that damage will be significantly increased if John is forced to discontinue his studies at Tulane because those with knowledge of the investigation will presume that he is guilty of sexual assault.

[49]    *See American Health Care*, 217 F. Supp. 3d at 946 (finding preliminary injunction appropriate to preserve status quo, when proposed rule changed practice that had been in place for years).

University felt such steps were necessary.[50] Tulane did not take such steps; Tulane's actions do not indicate a sincere belief that Plaintiff poses a threat.[51]

Further, while Tulane has an interest in enforcing its own disciplinary procedures, that interest is outweighed by the harm that Doe will suffer. As the federal court in Vermont held: "The harm Middlebury will suffer if Plaintiff is allowed to remain a student for the fall semester is not as great as the harm Plaintiff will suffer if he is not permitted to return to campus but ultimately prevails in this case."[52] In addition, although Jane will presumably resume her studies at Tulane in the Fall, nothing in her actions indicates that she is afraid of John or believes him to be a threat. Last semester, Jane enrolled in and continued attending a course with the same small section as John, despite alternative times to attend. The class proceeded without incident, including after the investigation report was issued and the appeal decided. There is simply no reason to believe that any threat or disruption will occur due to John's continued attendance.

Finally, the public interest will be served, rather than harmed, by injunctive relief. Holding universities accountable and ensuring that students are treated with fundamental fairness when faced with disciplinary allegations serves the public interest. At the very least, the public interest does not tip the scale one way or the other, and on balance, Doe is entitled to injunctive relief.[53]

**E.      A Bond Is Not Necessary In This Case.**

A bond is not necessary in this matter because the requested relief simply maintains the status quo. Pursuant to Rule 65(c), the Court "may elect to require no security at all."[54] Moreover,

---

[50]      *See* Code, at Sec. VIII.B.1 ("When a report of sex discrimination, such as sexual assault is received, the Title IX Coordinator, in consultation with other administrators as appropriate, will impose reasonable and appropriate interim measures when necessary to protect the safety of the parties or witnesses involved.").
[51]      *See, e.g.,* Exhibit "B," Temporary Restraining Order (finding public interest did not weigh in favor of denying injunctive relief where the university had taken few measures to restrict plaintiff's activities on campus).
[52]      *Middlebury College*, 2015 WL 5488109, at *4; *DePauw Univ.*, 2014 WL 4197507, at *14.
[53]      *See DePauw Univ.*, 2014 WL 4197507, at *14-15.
[54]      *See, e.g., A.T.N. Industries, Inc. v. Gross*, 632 Fed. Appx. 185 (5th Cir. 2015).

Defendant will not suffer financial harm if the injunction is granted – to the contrary, Plaintiff will pay tuition and fees to attend the Fall semester at Tulane.[55]

## **HEARING REQUESTED**

Plaintiff respectfully requests a hearing on his Motion for Preliminary Injunction.

## **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that, and after due proceedings are had, this Court grant his Motion for Preliminary Injunction.

June 28, 2019

<div style="margin-left:40%">

Respectfully Submitted,

*/s/ Ellie T. Schilling*
William P. Gibbens, 27225
Ellie T. Schilling, 33358
Schnonekas, Evans, McGoey
& McEachin, LLC
909 Poydras Street, Suite 1600
New Orleans, Louisiana 70112
Telephone: (504) 680-6050
Facsimile: (504) 680-6051
billy@semmlaw.com
ellie@semmlaw.com

-and-

Brian Capitelli, 27398
Justine Geiger Daniel, 36856
Capitelli & Wicker
1100 Poydras Street, Suite 2950
New Orleans, Louisiana 70163
Telephone: (504) 582-2425
Facsimile: (504) 582-2422
brian@capitelliandwicker.com
justine@capitelliandwicker.com

Attorneys for John Doe

</div>

---

[55] *See, e.g., PPGC, Inc. v. Kliebert*, 141 F. Supp. 3d 604, 652 (M.D. La. 2015) (finding bond not necessary where the requested relief would have no fiscal impact on the defendant).

## <u>CERTIFICATE PURSUANT TO LOCAL CIVIL RULE 65</u>

I, Ellie Schilling, counsel for Plaintiff John Doe, hereby certify that I have furnished a copy of the foregoing Motion for Preliminary Injunction, as well as copies of all other papers filed in the action to date, on Defendant via Fedex Overnight mail and by email on June 28, 2019, as follows:

**<u>BY FEDEX OVERNIGHT</u>**
The Administrators of the Tulane Educational Fund
c/o Tulane University
Office of the General Counsel
6823 St. Charles Avenue
300 Gibson Hall
New Orleans, Louisiana 70118


**<u>BY E-MAIL:</u>**
The Administrators of the Tulane Educational Fund
through its Associate General Counsel,
Howard T. Boyd, III (hboyd1@tulane.edu)


*/s/ Ellie T. Schilling*
ELLIE T. SCHILLING